UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JOHN MALIZIA and MARK PUSTULKA**, *on behalf of himself and all others similarly situated,* | Case No. |
| Plaintiffs, | |
| *v.* | **CLASS ACTION COMPLAINT** |
| **FCA US LLC** | **(JURY TRIAL DEMAND)** |
| Defendant. | |

Plaintiffs Mark Pustulka and John Malazia, ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through the undersigned counsel, bring this Class Action Complaint against Defendant FCA US LLC (also "Fiat Chrysler" or "Chrysler"). Plaintiffs allege the following based upon personal knowledge as to their own acts, and based upon the investigation conducted by their counsel as to all other allegations:

## NATURE OF THE CASE

1.     This action concerns Chrysler's refusal to honor its warranty and cover the cost of repairing a manufacturing defect in the engines of Chrysler's Jeep Wrangler model years 2012-2017 (collectively, "Jeeps" and "class vehicles").

2.     During the engine-production process, Chrysler does not sufficiently purge the casting sand from the engine (the "Manufacturing Defect"). As a result of excess sand in the engine, the Jeeps' radiators and oil coolers fill with a sludge-like residue that damages and ultimately destroys these and other components (collectively, "Affected Components") of the class vehicles.

3.     Chrysler knew or should have known about the Manufacturing Defect from pre-sale testing of the class vehicles before the sale of the first class vehicle in late 2011. Moreover, hundreds of publicly-available consumer complaints, as well as Chrysler's own customer

complaint records, gave Chrysler notice of the pervasiveness of the Manufacturing Defect as early as June 2012.

4.       Nonetheless, Chrysler did not disclose the Manufacturing Defect to past purchasers of class vehicles, even when customers brought their class vehicles into Chrysler dealerships for repair of the Manufacturing Defect, and Chrysler continued to sell class vehicles to consumers without disclosing the Manufacturing Defect.

5.       Every class vehicle was sold or leased pursuant to express and implied warranties, including a Powertrain Limited Warranty that covers the cost of all parts and labor needed to repair a powertrain component, including the engine, that is defective in workmanship and materials within five years or 100,000 miles, whichever occurs first, calculated from the start date of the Basic Limited Warranty.  The Basic Limited Warranty begins on the date a purchaser takes delivery of the vehicle or the date when the vehicle was first put into service, whichever is earlier.

6.       Plaintiffs, and other class vehicle owners and lessees similarly situated (the "Class" or "Class Members") requested that Chrysler, or through its authorized dealers, repair the Manufacturing Defect, but Chrysler refuses to cover the costs of labor and repair. Instead, Chrysler informed Plaintiffs and the Class either that the warranty did not cover the repair because the problem was created by "external factors" or owner "misuse" or that the warranty period had elapsed.

7.       Plaintiffs bring claims under breach of express warranty, breach of implied warranties, breach of the Magnusson Moss Warranty Act, and breach of New York General Business Law Section 349.  Plaintiffs and the Class seek to recover damages they incurred as a result of Chrysler's failure to inform Plaintiffs and the Class about the Manufacturing Defect and its failure to repair or replace the engine components damaged as a result of the Manufacturing Defect.  Moreover, Plaintiffs and the Class also seek a declaration that the Manufacturing Defect should be covered under the Powertrain Warranty and an extension of the Basic Limited Warranty to cover repair of the Affected Components damaged as a result of the Manufacturing Defect. Plaintiffs also request an injunction ordering Chrysler to inform purchasers of the class vehicle of

the Manufacturing Defect.  Plaintiffs seek attorneys' fees and costs, pre- and post-judgment interest, and all other remedies and relief permitted by law.

## THE PARTIES

8.      Plaintiff Mark Pustulka, proposed Class and Subclass representative, is a New York citizen who resides in Erie County.

9.      Plaintiff John Malizia, proposed Class and Subclass representative, is a New York citizen who resides in Orange County.

10.     Defendant FCA US LLC is a Delaware limited liability company with its headquarters in Auburn Hills, Metro Detroit.

## JURISDICTIONAL ALLEGATIONS

11.     The United States District Court for the Southern District of New York has original subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Class exceeds one hundred members, the aggregate amount in controversy (excluding interest and costs) exceeds $5,000,000, and there is the requisite degree of diversity of citizenship between the parties.

12.     The United States District Court for the Southern District of New York also has original subject matter jurisdiction over the Magnuson-Moss Warranty Act claim, 15 U.S.C. § 2301, pursuant to 28 U.S.C. § 1331.

13.     The United States District Court for the Southern District of New York can exercise supplemental jurisdiction over the Class's state law claims under 28 U.S.C. § 1367.

14.     The United States District Court for the Southern District of New York can exercise personal jurisdiction over Chrysler because it had regular and systematic contacts with the state of New York, in which it does business and places the Jeeps in the stream of commerce.

15.     The United States District Court for the Southern District of New York is a proper venue for this action, pursuant to 28 U.S.C. § 1391(b)(1), because Chrysler is subject to personal jurisdiction in this District, and the sale of Mr. Malizia's Jeep occurred in this District, and such sale gave rise to this action.

3

## THE DEFECT

16.    Many automotive manufacturers make engine component parts using a sand-casting method, which utilizes expendable sand molds to form complex metal parts from alloys. Upon information and belief, Chrysler used a sand-casting method in manufacturing component parts for the Jeep engines during the class period.

17.    Class vehicles have a Pentastar V-6 3.6-liter ("Pentastar") engine. Pentastar engine blocks are made using a die-casting method rather than a sand-casting method. However, the cylinder head that is located on top of the engines are made using a sand-casting method.

18.    This is not the first time Chrysler has experienced issues with its cylinder heads in the company's Pentastar engines.  In 2012, Chrysler voluntarily recalled 7,500 cylinder heads due to a "ticking" sound in the engine, stalling, and other problems during use.[1]

19.    Upon information and belief, during the production process, Chrysler does not sufficiently purge the sand from the cylinder head.  Thus, excess sand is left in the cylinder head that seeps out gradually as the vehicle is driven.

20.    All sand must be removed or destroyed during production of the cylinder head or other component engine parts will experience extensive problems.  Specifically, any residual sand that remains from the sand-casting process in the engine can also improperly circulate through the vehicle's cooling system and settle in the heater core, radiator, and oil cooling systems.  The sand forms a sludge-like build-up in the bottom of the radiator reservoir that continues to accumulate until heating and cooling systems malfunction and fail.

21.    Plaintiffs and the Class do not learn of the existence of the Manufacturing Defect until the heating and cooling systems fail even though the sand starts to shed from the cylinder head and collect in the radiator immediately after the vehicle is driven.

---

[1]    http://autoweek.com/article/car-news/dealers-repairing-chrysler-v6-engines-some-pentastars-need-new-cylinder-heads

22.    The failure of the heating and cooling functions in class vehicles compromises the safety of class vehicles.  Drivers without heat cannot defrost their vehicles, rendering them difficult or impossible to drive in cold-weather conditions and unsafe, especially when freezing precipitation occurs while driving.  Drivers without air cannot drive in hot-weather conditions.

23.    The Manufacturing Defect cannot be cured by normal automotive maintenance because regular engine flushes do not remove the sludge-like sand residue at the bottom of the radiator, which is too thick for such a procedure.  Moreover, any relief provided by a routine engine flush is, at best, only a temporary improvement because the casting sand has already circulated within the vehicle and continues to build up in the engine once the class vehicles resumes operation.

24.    Upon information and belief, engine flushes, radiator replacements, and heater core replacements, and air conditioning components will continue indefinitely until an engine without any leftover casting sand is installed in the Jeeps.

**CHRYSLER KNEW OR SHOULD HAVE KNOWN ABOUT THE DEFECT, IN PART, BECAUSE CONSUMERS HAVE EXTENSIVELY REPORTED THE DEFECT TO CHRYSLER.**

25.    There were thousands of Jeeps manufactured by Chrysler using the sand-casting method since 2012.  Moreover, there are numerous complaints on the Internet from absent Class members regarding the Defect:

**#18**  **Wrangler 3.6**
Automatic transmission    26,000 miles

I bought my 2012 Jeep Wrangler used in February 2015 with approximately 11,110 miles. By this winter (2016) I had put approximately 26,000 miles on the vehicle. When I went to turn on the heat the driver's side was blowing cold air and the passenger's side hot. I took it to my local garage and they said I had casting sand built up and suggested I replace my heater core and radiator. They encouraged me to contact Chrysler to see if they would do a "good faith" warranty replacement since this was a known problem. I called Chrysler and they said I needed to take my Jeep to a dealership for an official diagnostic test before they would make a decision. The dealership informed me that my heater core was already replaced in Jan. 2015 and likely needed to be replaced. The part was under a Mopar warranty thankfully, but Mopar wanted the dealership to flush the heater core before they would authorize replacement of the part. Soooo, my heater core was flushed and now I have heat again. However, if this is a problem that results from casting sand build up (which the dealership mechanic said it was) won't this just happen again? In summary, at 11,000 miles the heater core was replaced. The new heater core needed to be replaced after 26,000 miles, but was flushed instead. I'm thinking of trading in the 2012 model for a newer one if this is a known problem with this year...

http://www.carcomplaints.com/Jeep/Wrangler/2012/AC_heater/heater_not_working.shtml (last visited on May 25, 2016):

**#15**  **Wrangler Sport 3.6L**
Automatic transmission    18,000 miles

2012 Wrangler Sport. No heat on the drivers side. After doing some research I learned that this is a common problem with the Wranglers and is likely caused because casting sand had not been sufficiently flushed from the engine block when manufactured. Coolant stirs up the casting sand and it then settles in the bottom of the radiator, heater core and overflow tank. The sediment in the heater core restricts coolant flow causing poor heating of the vehicle.

I checked my overflow tank and found about 3" of sand in the bottom. The service manager at the Jeep dealership said he did not have a recall, campaign or service bulletin on this and it would not be covered by Jeep. He said he'd not heard of the issue, but when he asked fellow service managers they had heard of it in older Wranglers. This is a pretty outrageous issue if you ask me. Nobody but Jeep dealers have serviced the vehicle, so where would significant amounts of sand-like residue come from to get into the cooling system?

Any feedback or help from the community would be appreciated.

http://www.carcomplaints.com/Jeep/Wrangler/2012/AC_heater/heater_not_working.shtml (last visited on May 25, 2016)

**#21 Wrangler Sahara 3.6L**
Automatic transmission    46,500 miles

Bought this used 2012 Jeep Wrangler Unlimited Sahara in September, 2016 from a dealer in Cincinnati, Ohio. I test drove the vehicle on a 88 degree day so I couldn't tell if the heater was working properly or not. After getting it home to northern Michigan and turning on the heater on the first cool fall day, I immediately noticed just cool air coming from the heating system on the driver's side. After paying for a heater core flush and a thorough evaluation by the Jeep dealer it was determined that the heater core was plugged. I was informed at that time that there was no recall on the heater core and the repair was not covered by warranty. With winter on the way, I had not choice but to fix it at a cost of $1,163. It seems based on many other stories like this, Jeep obviously had a supplier problem and should step up to the plate and cover these repairs.

http://www.carcomplaints.com/Jeep/Wrangler/2012/AC_heater/heater_not_working.shtml    (last visited on May 25, 2016)



http://www.wranglerforum.com/f202/heater-core-no-drivers-heat-and-casting-sand-388066.html
(last visited on May 25, 2017)

**Heater Core, No Drivers Heat and Casting Sand**

I have a 2013 with 14,000 miles. The water pump was replaced in August at 9,600 miles due to the chirp.

I am currently getting blast furnace heat on the passenger side, Luke warm on the drivers side. I took it to the dealer today and they called, said it was fixed and blamed it on a sticky <u>actuator</u> in the duct work. When I arrived to pick it up, the problem was still there.

I explained the casting sand stories I have read on this forum and they said they would go ahead and replace the <u>heater</u> core tomorrow. They are expecting it to take two days because they have to pull the seats, console and dash. The A/C system also has to bled and then refilled.

http://www.wranglerforum.com/f202/heater-core-no-drivers-heat-and-casting-sand-388066.html
(last visited on May 25, 2017)

## CHRYSLER'S EXPRESS WARRANTIES COVER THE MANUFACTURING DEFECT

26.     Chrysler provides warranties for the class vehicles' engine blocks that cover the Manufacturing Defect, including (among others), a "New Vehicle Limited Warranty" that provides "bumper to bumper coverage for 3 years or 36,000 miles"; and a "Powertrain Limited Warranty" that provides coverage for the engine block for "5 years or 100,000 miles."  Under these and other warranties, Chrysler promised to repair or replace engine and other components arising from defects in materials or workmanship, including the Defect, at no cost to Class members.

27.     The Powertrain Limited Warranty covers the gasoline engine and the cylinder block, also known as the engine block. The engine cylinder block and all internal parts; cylinder head assemblies; timing case, timing chain, timing belt, gears and sprockets; vibration damper oil pump; water pump and housing; intake and exhaust manifolds; flywheel with starter ring gear; core plugs; valve covers; oil pan; turbocharger housing and internal parts; turbocharger wastegate actuator; supercharger; serpentine belt tensioner; and seals and gaskets.

28.     Chrysler's warranties appear in window labels on the vehicles, in the owner's manuals and brochures, and on the company's websites.

## PLAINTIFFS' EXPERIENCES

### Mark Pustulka

29.    In Fall 2013, Mark Pustulka purchased a used 2013 Jeep Wrangler Sport with 17,000 miles for personal and family use from the Keller Chevrolet, in Erie County, New York. Like all Chrysler vehicles, Plaintiff's class vehicle came with Chrysler's Limited Warranty and Powertrain Limited Warranty.

30.    Thereafter, Mr. Pustulka performed normal and routine maintenance. Further, the Mr. Pustulka were never informed in any way by Defendant that his class vehicle contained the Manufacturing Defect.

31.    In late October 2013 with approximately 18,000 miles on the vehicle, due to the cold weather, Mr. Pustulka attempted to utilize the heat in his class vehicle. However, it only emitted warm air from the vents despite the heat being set to the warmest setting. This condition continued to occur during the entire operation of the vehicle on that occasion and others going forward.

32.    In late October 2016, with approximately 47,000 miles on his vehicle, Mr. Pustulka again noticed his class vehicle only emitted warm air from the vents despite being set to the warmest setting. This was very troublesome for Mr. Pustulka as Buffalo experienced a colder than normal winter in late 2016 and early 2017. Mr. Pustulka would often drive his class vehicle without complete windshield visibility due to the Manufacturing Defect.

33.    On May 27 2017, at 46,371 miles and after repeatedly experiencing the same problems for the last few winters, Mr. Pustulka too his class vehicle to Northtown Chrysler Dodge Jeep Ram ("Northtown") in Tonawanda, NY[2] for repair. Upon inspection, Mr. Pustulka was informed that a failed heater core was the cause behind the inhibited heat function in his class vehicle. In addition, he was told the class vehicle needed to be flushed in order to properly fix the heating issue. Upon information and belief, unknown to Mr. Pustulka, a sludge -like residue had

---

[2] Northtown Chrysler Dodge Jeep Ram is an authorized Chrysler Dealership

been building up in the radiator for a number of years from residual sand from the engine casting process.

34.     Mr. Pustulka was informed that the heater core was plugged  and would need to be replaced. Mr. Pustulka was also informed that the repair was not covered under warranty because the repairs were outside the 3 year/36,000 mile warranty and was not covered under the 5 year/100,000 mile power train warranty.

35.     Mr. Pustulka was quoted $1573.05 by Northtown Jeep to replace the heater core and flush his class vehicle.  Mr. Pustulka objected to paying this amount. Northtown Jeep never disclosed that the Manufacturing Defect damaged the radiator, oil cooler, and heater core, as explained herein. In addition, Northtown Jeep did not replace nor repair the engine components which were the source of the aforementioned problems. As such, Mr. Pustulka fears that the component parts that were replaced are being damaged again. Because the defect was present at the point of sale and was not disclosed to Mr. Pustulka, he did not receive the benefit of their bargain as he either would not have purchased the vehicle if he had been advised of the defect or he would have paid less for it than they did.

36.     Currently, Mr. Pustulka has 53,850 miles on his vehicle and continues to use the vehicle without heating.

**John Malizia**

37.     In April, 2013, John Malizia purchased a new 2013 Jeep Wrangler from then Chrysler Dodge Jeep of Newburgh in Newburgh, New York. Like all Chrysler vehicles, Mr. Malizia's vehicle came with Chrysler's Limited Warranty and Powertrain Limited Warranty.

38.     Thereafter, Mr. Malizia performed normal and routine maintenance on his vehicle. Further, Mr. Malizia was never informed in any way by Defendant that his class vehicle contained the Manufacturing Defect.

39.     In February 2017, with approximately 85,000 miles on his vehicle, Mr. Malizia due to the cold weather, attempted to utilize the heat in his class vehicle. However, his class vehicle only emitted warm air on the drivers side of the vehicle despite the heat being set to the warmest

setting. On the other hand, the passengers side emitted very warm air when the heat was set to the highest setting this condition continued to occur during the entire operation of the vehicle on that occasion and others going forward.

40.     On April 21, 2017, frustrated with his class vehicle's heating issues during a cold winter, Mr. Malizia went to Hudson Valley Chrysler Dodge Jeep for an inspection. Upon inspection, Mr. Malizia was told the heater core in his vehicle needed to be replaced. Mr. Malizia was told it would take 9 hours of labor and the part would cost $250.  In total, Mr. Malizia was quoted $1300 to replace his class vehicle's heater core.

41.     Thereafter, Mr. Malizia contacted his insurance company, Zurich, to see if he could be reimbursed for such a costly repair. Zurich informed Mr. Malizia that if his class vehicle's heater core was clogged, they would not reimburse him for the cost to repair his class vehicle's heater core. However, they informed him if his class vehicle's heater core was broken, they would reimburse him for the entirety of the cost to replace his class vehicle's heater core.

42.     A few days later, to the disappointment of Mr. Malizia, Hudson Valley Chrysler Dodge Jeep informed Mr. Malizia that they could only diagnose his class vehicle's heater core as being clogged after removing and inspecting the part. Thus, if Mr. Malizia's heater core happened to be clogged with sediment rather than broken, he would be responsible for the $1300 heater core replacement. Unwilling to take the risk of a repair he could not afford, Mr. Malizia instructed technicians at Hudson Valley Chrysler Dodge Jeep to not conduct the inspection.

43.     Currently, Mr. Malizia's class vehicle has 94,000 miles and he continues to use the vehicle with luke warm heating on his drivers side.

## CLASS ALLEGATIONS

44.     At the time of Plaintiffs and the Class' purchases, Chrysler failed to disclose the consumer complaints, malfunctions, safety hazards, and material facts related to the class vehicles' Manufacturing Defect and the Affected Components.

45.     Before Plaintiffs purchased their class vehicles, Plaintiffs were never informed of, or aware of, the class vehicles' Manufacturing Defect and the Affected Components.

46.     Had Chrysler disclosed the defect, Plaintiffs would not have purchased the class vehicle or would have paid significantly less for it. Plaintiffs were denied information material to their purchase and willingness to use the class vehicle.

47.     Due to the Defect, the value of the Jeeps at the time or purchase or lease was less than the amounts Class members paid.

48.     The Defect causes the Jeeps to lose value, including trade-in and re-sale value.

49.     The Defect causes Class members to face repair costs, and to lose use and enjoyment of the Jeeps, and to suffer time and burden arranging and obtaining repairs.

## PROPOSED CLASS

50.     Plaintiffs bring this case as a class action under Fed. R. Civ. P. 23(b)(2) and/or 23(b)(3) on behalf of the following Class:

> **Nationwide Class.** All persons who purchased or leased a 2012-2017 Chrysler Jeep Wrangler in the United States.

51.     Plaintiffs bring this case on behalf of the following state-wide Subclass:

> **New York Subclass.** All persons who purchased or leased a 2012-2017 Chrysler Jeep Wrangler in the State of New York.

## CLASS CERTIFICATION ALLEGATIONS

52.     **Numerosity.** The Class and the New York Subclass is comprised of thousands of Chrysler Jeep Wrangler owners throughout the United States and within New York, making joinder impossible.

53.     **Commonality.** Questions of law and fact exist that are common to all Class and Subclass Members, and predominate over any questions that affect only individual Class and Subclass Members, including (among others):

a.     Whether Model Year 2012-2017 Jeep Wranglers engines suffer from a Manufacturing Defect;

b.     Whether the Manufacturing Defect causes damage to the Affected Components;

c.      Whether the Manufacturing Defect existed at the time of the manufacture of the class vehicles;

d.      Whether Chrysler knew or should have known about the Manufacturing Defect

e.      Whether Chrysler failed to disclose Manufacturing Defect at the time that Class and Subclass Members purchased the class vehicles or thereafter;

f.      Whether Chrysler breached its express warranties by refusing to repair the Manufacturing Defect;

g.      Whether Chrysler's failure to disclose the Manufacturing Defect constitutes an unfair and deceptive act or practice in violation of New York General Business Law Section 349;

h.      Whether Chrysler acted or refused to act on grounds generally applicable to the Class and Subclass, thereby making the award of equitable relief appropriate to the Class and Subclass as a whole;

i.      Whether Chrysler's conduct violates state law pursuant to Magnusson Moss Warranty Act.

j.      Whether the Manufacturing Defect impairs the value of the Jeeps;

54.    **Typicality.** Plaintiffs' claims are typical of the claims of Class and Subclass Members;

55.    **Adequate Representation.** The Plaintiffs are adequate representatives of the Class.

56.    **Superiority.** A class action is a superior method for adjudicating the claims at issue in this case and class-wide adjudication can be efficiently managed.

57.    **Predominance.** This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members.

58.    Class-wide injunctive, declaratory, or equitable relief is appropriate.

## **TOLLING OF STATUTE OF LIMITATIONS**

59.    **Active Concealment Tolling.** Any statutes of limitations are tolled by Chrysler's knowing and active omission of the fact that the transmission suffered from a defect. Chrysler kept Plaintiffs and all Class and Subclass Members ignorant of vital information essential to the pursuit of their claims, without any fault or lack of diligence on the part of Plaintiffs. The details of Chrysler's efforts to omit its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and the Class and Subclass Members. Plaintiffs could not reasonably have discovered the fact that the transmissions suffered from a defect that would cause repeated and significant failures.

60.    **Estoppel.** Chrysler was and is under a continuous duty to disclose to Plaintiffs, as well as Class and Subclass Members, the true character, quality, and nature of the transmissions. At all relevant times, and continuing to this day, Chrysler knowingly, affirmatively, and actively misrepresented and omitted the true character, quality, and nature of the problems caused by sand-residue to external or operator factors. The details of Chrysler's efforts to omit its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class and Subclass Members. Plaintiffs and Class and Subclass Members reasonably relied upon Chrysler's knowing and/or active omissions. Based on the foregoing, Chrysler is estopped from relying upon any statutes of limitation in defense of this action.

61.    **Equitable Tolling.** Chrysler took active steps to omit the fact that it wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold, and/or leased the class vehicles with the problems caused by sand-residue to external or operator factors. The details of Chrysler's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class and Subclass Members. When Plaintiffs learned about this material information, they exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims. Chrysler wrongfully omitted its deceitful acts described above. Should it be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

62.    Given Chrysler's active and knowing concealment of the Defect, and the company's false and misleading statements attributing the problems caused by sand-residue to external or operator factors, equitable tolling of the statutes of limitations or repose applicable to the causes of action brought in this case is appropriate.

63.    Plaintiffs and Class members could not have reasonable discovered the true reasons for the Defect until the recent investigation which led to the filing of this Complaint.

### FIRST CAUSE OF ACTION
**Breach of Express Warranties**
**(On Behalf of the Nationwide Class or, in the alternative, the New York Subclass)**

64.    Plaintiffs, on behalf of the Class or, in the alternative, the York Subclass, incorporate all of the foregoing allegations into this cause of action.

65.    Chrysler expressly warrantied that it would cover the cost of all parts and labor needed to repair any item on the vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation.

66.    Chrysler materially breached its express warranties by manufacturing, selling, and leasing Jeeps that contained the Manufacturing Defect, which rendered the vehicles unsafe or unfit for use as warrantied.

67.    Chrysler was put on notice of the breach by Plaintiffs' efforts to get the vehicle repaired at its authorized dealerships.

68.    In addition, Chrysler's express warranty has failed of its essential purpose due to the Manufacturing Defect continuing to manifest despite efforts by Plaintiffs and Class members to have their Jeeps repaired, yet the Manufacturing Defect remains. Namely, the casting sand remains in the cylinder head and until replaced, will continue to damage and destroy the engine components, radiator, oil cooler, and heater core.

69.    As a result of Chrysler's breach of warranties, Class members have sustained damages, including diminished value of the class vehicles.

70.     Chrysler's time limits on its warranties are unconscionable because Chrysler knew or had reason to know that Plaintiffs and Class members would not experience or detect sludge like sand build-up in the early life of the Jeep and, in many instances, such manifestation of the Manufacturing Defect would only occur after the warranty period had expired.  And by making false and misleading representations about the nature of the Defect, Chrysler further prevented Class members from timely exercising their rights under the warranties.

71.     Plaintiffs and Class members are entitled to recover all damages as a result of said breach of warranties in an amount in excess of $5,000,000.

## SECOND CAUSE OF ACTION
### Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*
### (On Behalf of the Class or, in the alternative, the New York Subclass)

72.     Plaintiffs, on behalf of the Class or, in the alternative, the New York Subclass, incorporate all of the foregoing allegations into this cause of action.

73.     Under the Magnuson-Moss Warranty Act, Plaintiffs and Class members are "consumers," Chrysler is a "supplier" and "warrantor," and the Jeeps (and their defective engine blocks) are "consumer products."

74.     15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

75.     Chrysler's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The class vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

76.     Chrysler breached these warranties as described in more detail above. Without limitation, the class vehicles are equipped with the Manufacturing Defect. The class vehicles share a common Manufacturing defect in that casting sand remains in the cylinder head and until replaced, will continue to damage and destroy the engine components, radiator, oil cooler, and heater core.

77.    Under the Act, Chrysler was obligated to disclose to Class members the known Defect within the Jeeps, and was obligated to repair or otherwise remedy the Manufacturing Defect.

78.    Plaintiffs and each member of the Class have had sufficient direct dealings with Chrysler or its agents (including dealerships) to establish privity of contract between Chrysler, on the one hand, and Plaintiffs and each member of the Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each member of the Class are intended third-party beneficiaries of contracts between Chrysler and its dealers, and specifically, of Chrysler's implied warranties. These dealers were not intended to be the ultimate consumers of the class vehicles and have no rights under the warranty agreements provided with the class vehicles; the warranty agreements were designed for and intended to benefit consumers only.

79.    Chrysler failed to meet its disclosure and remedy obligations, despite reasonable opportunity to do so.

80.    Chrysler's violation of the Act caused damage to Class members and entitles them to statutory relief.

### THIRD CAUSE OF ACTION
**Breach of Implied Warranties**
**(On Behalf of the Nationwide Class and Each State Class)**

81.    Plaintiffs incorporate all of the foregoing allegations into this cause of action.

82.    Chrysler warrantied that the Jeeps were of merchantable quality and fit for their ordinary purpose.  Chrysler warrantied that the Jeeps' engine blocks had been properly made and would not emit casting sand over time into the radiator and other components, damaging them. Chrysler breached these implied warranties: the Jeeps were not merchantable because you could not drive them or drive them safely; and the Jeeps' engine blocks had not been properly manufactured but instead emitted casting sand over time into the radiator and other components, damaging them, such that the Jeeps' heating and defrosting mechanisms did not work properly even during the early life of the vehicles.

83.     Plaintiffs and each member of the Class have had sufficient direct dealings with Chrysler or its agents (including dealerships) to establish privity of contract between Chrysler, on the one hand, and Plaintiff and each member of the Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each member of the Class are intended third-party beneficiaries of contracts between Chrysler and its dealers, and specifically, of Chrysler's implied warranties. These dealers were not intended to be the ultimate consumers of the class vehicles and have no rights under the warranty agreements provided with the class vehicles; the warranty agreements were designed for and intended to benefit consumers only.

84.     As a result of Chrysler's breaches of implied warranties, Class members suffered damages.

**FOURTH CAUSE OF ACTION**
**Negligence**
**(On Behalf of the Nationwide Class and Each State Class)**

85.     Plaintiffs incorporate all of the foregoing allegations into this cause of action.

86.     Chrysler owed Class members a duty of reasonable care to properly produce the Jeeps' engine blocks and to take all necessary steps to eliminate casting sand from the blocks.

87.     Chrysler breached its duty by failing to properly produce the Jeeps' engine blocks and failing to take all necessary steps to eliminate casting sand from the blocks.

88.     As a direct and proximate result of Chrysler's negligence, casting sand remained in the blocks and created the Defect, which caused damages to Class members.

**FIFTH CAUSE OF ACTION**
**(For Unfair and Deceptive Trade Practices in Violation of New York General Business Law ("GBL") Section 349, et seq.)**
**(On Behalf of the New York Subclass)**

89.     Plaintiffs, on behalf of the New York Subclass, incorporate all of the foregoing allegations into this cause of action.

90.     The sale and distribution of the Class Vehicles in New York was a consumer-oriented act and thereby falls under the New York deceptive acts and practices statute, General Business Law Section 349.

91.     Chrysler violated GBL Section 349 by representing that the class vehicles, their engine blocks, and related components had characteristics, uses, or benefits which they did not have, or that the class vehicles, their engine blocks, and related components were of a particular standard, quality, or grade which they were not.

92.     Chrysler's scheme and concealment of the true characteristics of the Manufacturing Defect were material to the New York Subclass, as Chrysler intended. Had they known the truth, the New York Subclass Class would not have purchased or leased the class vehicle, or—if the class vehicle's true nature had been disclosed and mitigated, would have paid significantly less for them.

93.     The New York Subclass members had no way of discerning that Chrysler's representations were false and misleading, or otherwise learning the facts that Chrysler had concealed or failed to disclose, because the Manufacturing Defect was extremely latent in nature. New York State Subclass members did not, and could not, unravel Chrysler's deception on their own.

94.     Chrysler had an ongoing duty to the New York Subclass to refrain from unfair and deceptive practices under GBL Section 349 in the course of their business. Specifically, Chrysler owed New York Subclass members a duty to disclose all material facts concerning the Manufacturing Defect because they possessed exclusive knowledge, they intentionally concealed it from the New York Subclass, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

95.     Chrysler's violations present a continuing risk to the New York Subclass, as well as to the general public. Chrysler's unlawful acts and practices complained of herein affect the public interest.

96.     As a result of Chrysler's statutory violations, New York Subclass members sustained injuries and are entitled to relief under the Act.

**SIXTH CAUSE OF ACTION**

**(For False Advertising in Violation of New York Gen. Bus. Law Section 350, et seq.)**

**(On Behalf of the New York Subclass)**

97. Plaintiffs, on behalf of the New York Subclass, incorporate all of the foregoing allegations into this cause of action.

98. Chrysler was engaged in the "conduct of business, trade or commerce." GBL Section 350. False advertising includes "advertising, including labeling, of a commodity. . . if such advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity. . ." GBL Section 350-a.

99. Chrysler caused to be made or disseminated through New York, via advertising, marketing, and other publications, statements, and omissions that were untrue or misleading to Plaintiffs and New York Subclass Members.

100.   Chrysler made numerous material misrepresentations and omissions of fact with intent to mislead and deceive concerning the Class Vehicles, particularly with regard to the Manufacturing Defect. Specifically, Chrysler intentionally concealed and suppressed material facts concerning the quality of the Class Vehicles in order to intentionally and grossly defraud and mislead Plaintiffs and New York Subclass Members concerning the Manufacturing Defect.

101.   The misrepresentations and omissions set forth above were material and likely to deceive a reasonable consumer. The inherent Manufacturing Defect was undetectable to the ordinary consumer.

102.   Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and New York Subclass Members.

103.   Chrysler's false advertising was likely to and did, in fact, deceive reasonable consumers including Plaintiffs and New York Subclass Members about the true characteristics of the Manufacturing Defect.

104.   Chrysler's violations of GBL Section 350 present a continuing risk to Plaintiffs and to the general public. Chrysler's deceptive acts and practices affect the public interest.

105.   The Class Vehicles do not perform as advertised and make them far less valuable than advertised.

106.   Plaintiffs and New York Subclass Members who purchased Class Vehicles either would not have purchased those vehicles at all or else paid less for the Class Vehicles but for Chrysler's false advertising in violation of  GBL Section 350. New York Subclass Members who leased Class Vehicles either would not have leased them at all or would have leased them at a lower cost but for Chrysler's false advertising in violation of GBL Section 350.

107.   Plaintiffs and New York Subclass Members have suffered injury-in-fact and/or actual damages and ascertainable loss as a direct and proximate result of Chrysler's false advertising in violation of GBL Section 350, including but not limited to purchasing or leasing a diminished value or complete lost value for the Class Vehicles purchased or leased.

108.   Plaintiffs and New York Subclass Members have suffered lost or diminished use, enjoyment, and utility of their Class Vehicles along with suffering annoyance, aggravation, and inconvenience resulting from Chrysler's violations of GBL Section 350.

109.   Plaintiffs and New York Subclass Members seek monetary relief against Chrysler measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500.00 each for New York Subclass Member. Because

Chrysler's conduct was committed willingly and knowingly, Plaintiff and New York Subclass Members are entitled to recover three times actual damages, up to 10,000.00.

110.    Plaintiffs and New York Subclass Members also seek an order enjoining Chrysler's false advertising and further seeks attorneys' fees and any other just and proper relief under GBL Section 350.

## PRAYER FOR RELIEF

Therefore, Plaintiffs seek judgment against Chrysler and relief as follows:

1.    An Order certifying this case as a Class Action;

2.    An Order appointing the Plaintiffs as Class Representatives of the National Class and of the New York Subclass;

3.    An Order appointing Plaintiffs' counsel as Class Counsel;

4.    Damages and other relief under statutory or common law;

5.    Attorney's fees and costs;

6.    Pre- and post-judgment interest;

7.    Declaratory, injunctive, and equitable relief; and

8.    Such other relief as is just and proper.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the proposed Class and Subclass, hereby demand a trial by jury as to all matters so triable.


This the 15th day of September 2017.

Respectfully submitted,


/s/ Mitchell M. Breit_____
Mitchell M. Breit
Paul J. Hanly, Jr.
**SIMMONS HANLY CONROY LLC**
112 Madison Avenue
New York, New York 10016-7416

Telephone:  (212) 784-6400
Facsimile:  (212) 213-5949
phanly@simmonsfirm.com
mbreit@simmonsfirm.com

Daniel K. Bryson
John Hunter Bryson
**WHITFIELD BRYSON & MASON LLP**
900 W. Morgan Street
Raleigh, NC 27603
Tel: (919) 600-5000
Fax: (919) 600-5035
dan@wbmllp.com
hunter@wbmllp.com

Gregory F. Coleman
**GREG COLEMAN LAW PC**
 First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: 865-247-0080
Fax: 865-522-0049
greg@gregcolemanlaw.com

*Attorneys for Plaintiffs*