UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JOHN MALIZIA, MARK PUSTULKA**, **STEPHANIE MALEC and RICHARD MALEC**, **DOMENICK FRANDINA, and CHRISTOPHER ZIMMERMANN** *on behalf of themselves and all others similarly situated,*<br><br>                    Plaintiffs,<br>*v.*<br><br>**FCA US LLC**<br><br>                    Defendant. | Case No. 1:17-cv-07039<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**(JURY TRIAL DEMAND)** |

Plaintiffs John Malizia, Mark Pustulka, Stephanie and Richard Malec, Domenick Frandina, Christopher Zimmermann ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through the undersigned counsel, bring this First Amended Class Action Complaint against Defendant FCA US LLC ("Defendant," "Fiat Chrysler," or "Chrysler"). Plaintiffs allege the following based upon personal knowledge as to their own acts, and based upon the investigation conducted by their counsel as to all other allegations.

## NATURE OF THE CASE

1.     This action concerns Chrysler's refusal to honor its warranty and cover the cost of repairing a defect in the engines of Chrysler's Jeep Wrangler model years 2012-2017 (collectively, "Jeeps" and "class vehicles").

2.     During the engine-production process, FCA fails to institute adequate quality control measures that sufficiently remove a variety of foreign substances and contaminants within the engine during the engine finishing process. As a result of FCA's failure, contaminants remain in the engine system and disperse into other parts of the vehicle during normal vehicle

operation.  These contaminants include, among other things, casting-sand,[1] welding flux,[2] and other particulate matter, such as silica[3] (a mix of sand and chemicals). These contaminants remain in a closed system and, over time, form a "sludge" or "gunk" that builds up in the vehicle's components in or connected to the closed system, including the heater core, radiator, and oil cooler, causing these components to fail (hereinafter "the Defect").

3.      As a result of the build-up and dispersion of the sludge within the closed system, damages are caused to the vehicle, which typically first manifest as loss of heating or air conditioning.

4.      Chrysler knew or should have known about the Defect from pre-sale testing of the class vehicles before the sale of the first Class Vehicle in late 2011.  Moreover, hundreds of publicly-available consumer complaints, as well as Chrysler's own customer complaint records, gave Chrysler notice of the pervasiveness of the Defect as early as June 2012. Upon information and belief Chrysler internally began investigating these complaints in or around November 2012 as a result of numerous customer complaints of "no heat," especially when owners tried to use the heating system during the beginning of colder weather. These consumers were not able to heat their vehicles properly nor defrost their windshields, causing comfort and safety-related issues.

5.      Upon information and belief, dealers communicated directly to Chrysler in 2012 that customers were complaining their vehicles had no heat on either one side or both sides. Dealers were finding, among other manifestations of the problem, plugged heaters cores, and oil cooler and radiator issues. Upon information and belief, as the weather grows colder, the environmental conditions lead to an increase in customer complaints of plugged heater cores, and radiators and oil coolers that have been negatively impacted because of the Defect.

---

[1] Engine cylinder heads are manufactured using a sand-casting process. The cylinder head molds are made of sand, into which liquid metal is poured. Then the cylinder heads must be thoroughly cleaned, rough cut, and heat treated before moving down the production line.
[2] Welding flux is used to solder two pieces of metal together. Excess flux used later causes chemical reactions, including helping to create sludge in the Jeeps.
[3] Silica is a chemical by product of the sand used during the sand-casting process.

6.      Upon information and belief, the problem is such that it occurs in the Class Vehicles like Plaintiffs' Jeep, as well as across other Jeep model lines. Moreover, it is a type of Defect that the customer would not know existed until the symptoms began to occur both within and without the applicable warranty period.

7.      Upon information and belief, the contaminants and various substances that collect to create the "sludge" or "gunk" include, but are not limited to: sand (silicon), ammonium oxide hydroxide, sodium and other production process products.

8.      When Chrysler advertises the standard equipment and options included on its Jeeps, it fails to notify consumers that from the point of sale forward, due to the defect, certain component parts including the heating and air conditioning system will gradually fail as a result of the sludge build-up as described herein. This omission is material to consumers who are deciding whether to purchase a Class Vehicle or not.

9.      Nevertheless, Chrysler did not disclose the Defect to purchasers of class vehicles, even when customers brought their class vehicles into Chrysler dealerships for repair of the Defect, and Chrysler continued to sell class vehicles to consumers without disclosing the Defect at the point of sale.

10.     Every class vehicle was sold or leased pursuant to express and implied warranties, including a Powertrain Limited Warranty that covers the cost of all parts and labor needed to repair a powertrain component, including the engine, that is defective in workmanship and materials within five years or 100,000 miles, whichever occurs first, calculated from the start date of the Basic Limited Warranty.  The Basic Limited Warranty begins on the date a purchaser takes delivery of the vehicle or the date when the vehicle was first put into service, whichever is earlier.

11.     When Plaintiffs, as well as other similarly situated class vehicle owners and lessees (the "Class" or "Class Members"), sought repairs related to the Defect at authorized Chrysler service facilities, Chrysler did not disclose the  Defect despite its knowledge of how this defect is manifested in the class vehicles. In addition, Chrysler refuses to cover the costs of labor and to repair the class vehicles when the Defect manifests. Instead, Chrysler informed Plaintiffs and other

Class Members that the warranty did not cover the repairs blaming the problems on "external factors," owner "misuse," or claiming that the applicable warranty period had elapsed, even when the Powertrain Warranty was still in effect.

12.     Plaintiffs bring claims under breach of express warranty, breach of the Magnuson-Moss Warranty Act, breach of implied warranties, breach of New York General Business Law Section 349, and For False Advertising in Violation of New York Gen. Bus. Law Section 350. Plaintiffs and the Class seek to recover damages they incurred as a result of Chrysler's failure to inform Plaintiffs and the Class about the Defect and its failure to repair or replace the engine components damaged as a result of the Defect.  Moreover, Plaintiffs and the Class also seek a declaration that the Defect should be covered under the Powertrain Warranty and an extension of the Basic Limited Warranty to cover repair of the Affected Components damaged as a result of the Defect.  Plaintiffs also request an injunction ordering Chrysler to inform purchasers of the class vehicle about the Defect.  Plaintiffs seek attorneys' fees and costs, pre- and post-judgment interest, and all other remedies and relief permitted by law.

## THE PARTIES

13.     Plaintiff John Malizia, proposed Class and Subclass representative, is a New York citizen who resides in Orange County.

14.     Plaintiff Mark Pustulka, proposed Class and Subclass representative, is a New York citizen who resides in Erie County.

15.     Plaintiffs Richard and Stephanie Malec, proposed Class and Subclass representatives, are New York Citizens who reside in Wayne County.

16.     Plaintiff Domenick Frandina, proposed Class and Subclass representative, is a New York citizen who resides in Nassau County.

17.     Plaintiff Christopher Zimmermann, proposed Class and Subclass representative, is a New York citizen who resides in Suffolk County.

18.     Defendant FCA US LLC is a Delaware limited liability company with its headquarters in Auburn Hills, in Detroit, Michigan.

## JURISDICTIONAL ALLEGATIONS

19.     The United States District Court for the Southern District of New York has original subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Class exceeds one hundred members, the aggregate amount in controversy (excluding interest and costs) exceeds $5,000,000, and there is the requisite degree of diversity of citizenship between the parties.

20.     The United States District Court for the Southern District of New York also has original subject matter jurisdiction over the Magnuson-Moss Warranty Act claim, 15 U.S.C. § 2301, pursuant to 28 U.S.C. § 1331.

21.     The United States District Court for the Southern District of New York can exercise supplemental jurisdiction over the Class's state law claims under 28 U.S.C. § 1367.

22.     The United States District Court for the Southern District of New York can exercise personal jurisdiction over Chrysler because it had regular and systematic contacts with the State of New York, in which it does business and places the Jeeps in the stream of commerce.

23.     The United States District Court for the Southern District of New York is a proper venue for this action, pursuant to 28 U.S.C. § 1391(b)(1), because Chrysler is subject to personal jurisdiction in this District, and the sale of Mr. Malizia's Jeep occurred in this District, and such sale gave rise to this action.

## THE DEFECT

24.     Many automotive manufacturers, including Chrysler, use a sand-casting method and a variety of other contaminants in manufacturing component parts for the Jeep engines during the class period. During the engine-production process, Chrysler does not sufficiently purge the materials including but not limited to ammonium oxide hydroxide, sodium, silicon (sand) and other production process products from the engine. As a result of these excess corrosion contaminants in the engine, the Jeeps' radiators, heater cores, and oil coolers fill with a "sludge"-like residue (also referred to as "flux," "gunk," or similarly descriptive terms) that damages and ultimately destroys these and other components of the class vehicles. Upon information and belief, excessive

"sludge," "flux," "gunk" and related corrosion contaminants cause premature aging of the coolant, which leads to plugging of the heater core, oil cooler, radiator and related parts.

25.     Upon information and belief, as a result of Chrysler's inability to sufficiently purge these contaminates, as the vehicle is driven, these excess contaminants gradually seep from the engine, and engine components and into other parts of the vehicle, including but not limited to: the radiator, heater core, water pump, and oil cooler. Despite complex and intertwined engine degradation due to the different contaminants, the defect often initially manifests itself as inhibited or failure of the heating and air conditioning within the class vehicle.

26.     The nature and source of the Defect is so initially subtle that Chrysler created a STAR REPORT as a tool to advise service mechanics so they would be able to properly diagnose, fix, and treat customers who complained of "Poor Heating Performance" that results from the Defect.

27.     In December of 2012, Chrysler sent dealers a STAR report that extensively detailed how to diagnose, and properly remove the sludge and gunk-like residue from the radiators and oil coolers.[4]

---

[4] STAR report of defect from December 12, 2012 that was found online.



Case Number:   S120700000

**Release Date:**   12/12/2012

**Symptom/Vehicle Issue:**  Poor Heater System Performance

**Note:** Sludge may build up and restrict coolant flow in the heater core. The heater core may still be restricted even if sludge is not visible in the overflow bottle.

**Diagnosis:**
1.  Remove radiator cap and inspect coolant overflow bottle for buildup of sludge on. See (FIG1) and (FIG2)

Sludge

(FIG1)

_Contact the STAR Center for assistance if no solution is found_

er Group LLC



(FIG2)

2. Is sludge found in the coolant overflow bottle?
   a. Yes >>> Proceed to repair procedure.
   b. No >>> Proceed to step 3.
3. Re install the radiator cap and run the engine until operating temperature is reached.
4. Operate the HVAC in full heat  panel setting and inspect that heat is produced on both sides of the vehicle.
5. Is heat produced on both sides of the vehicle?
   a. Yes >>> This Star Case does not apply.
   b. No >>> Proceed to repair procedure.

**Repair Procedure:** If Sludge is found in the radiator overflow bottle or poor heat is produced by the HVAC system the following repair procedure should be followed

1. Flush cooling system with Mopar Cooling System Flush 07 – Cooling > Standard Procedure CLEANING > REVERSE FLUSHING.

**Note:** Repeat flushing until the system produces clear water.

2. Replace the following components
   • Radiator 07 – Cooling > Engine > RADIATOR, Engine Cooling > Removal
   • Heater core 24 - Heating and Air Conditioning > Plumbing > CORE, Heater > Removal
   • Radiator cap
   • Engine Oil Cooler 09 – Engine > 3.6L/Lubrication > COOLER Oil > Removal
3. Refill the cooling system with the appropriate coolant and perform verification.

28.     Upon information and belief, Chrysler dealers use the directions in the STAR case to properly diagnose the sludge and gunk-like residue and replace the heater core or radiator within customers' vehicles. However, often customers are forced to pay out of pocket for new radiator and heater cores that have been damaged by the sludge due to the proper diagnosis being outside of the Basic Limited Warranty or Powertrain Limited Warranty.

29.     All sand, flux, debris, and other particulate matter, including aluminum oxide hydroxide, must be removed or destroyed during production of the engine, and other engine components, or other parts of the vehicle will suffer extensive problems.  Specifically, any residual sand and flux that remains from the sand-casting process in the engine will improperly circulate through the vehicle's cooling system and settle in the heater core, radiator, and oil cooling systems. As a result, the sand and flux forms the sludge-like substance described herein, which accumulates in the bottom of the radiator reservoir and continues to accumulate until component parts begin to fail.

30.     Although the sand, flux, debris, and other contaminates start to shed from the engine, and other engine components immediately upon initial operation of the vehicle collecting in the radiator and heater core, Plaintiff and the Class first experience an indication of the defect when their heating and cooling systems fail, and then, only with extensive research and enough mechanical knowledge and understanding, do the class members learn of the existence of the Defect.

31.     The failure of the heating and cooling functions in class vehicles compromises the safety of class vehicles.  Drivers without heat are unable to defrost their vehicles, rendering them difficult or impossible to drive in cold-weather conditions and unsafe, especially when freezing precipitation occurs while driving. Fogged and frosted windows narrow or eliminate the driver's visibility, especially at times when the road conditions are especially hazardous.  Likewise, drivers without air conditioning are hampered from driving their vehicles in extreme heat.

32.     The Defect cannot be cured through normal automotive maintenance because even regular engine flushes do not remove the sludge-like gunk residue at the bottom of the radiator,

which is too thick to remove by such a procedure.  Moreover, any relief provided by a routine engine flush is, at best, only a temporary improvement because the sludge is already circulating within the components of the vehicle and continues to build up in the engine and affected component parts as soon as the class vehicle resumes operation.

33.     Upon information and belief, engine flushes, radiator replacements, heater core replacements, and replacements of air conditioning components will continue indefinitely until an engine without any leftover production process contaminants (i.e. casting sand, ammonium oxide hydroxide, sodium, silicon (sand) and other materials) is installed in the class vehicle.

## CHRYSLER KNEW OR SHOULD HAVE KNOWN ABOUT THE DEFECT, IN PART, BECAUSE CONSUMERS HAVE EXTENSIVELY REPORTED THE DEFECT TO CHRYSLER.

34.     Since 2012, thousands of Jeeps have been manufactured by Chrysler using the same methodology that results in harmful contaminants remaining in the closed engine system (i.e. casting sand, welding flux, and other particulate matter including silica).  Moreover, numerous complaints are posted on the Internet and NHSTA from absent Class members regarding the Defect that discuss among other things the safety issues involved because the windshield on the driver's side will not properly defrost during cold or inclement weather:



**#18   Wrangler 3.6**
Automatic transmission   26,000 miles

I bought my 2012 Jeep Wrangler used in February 2015 with approximately 11,110 miles. By this winter (2016) I had put approximately 26,000 miles on the vehicle. When I went to turn on the heat the driver's side was blowing cold air and the passenger's side hot. I took it to my local garage and they said I had casting sand built up and suggested I replace my heater core and radiator. They encouraged me to contact Chrysler to see if they would do a "good faith" warranty replacement since this was a known problem. I called Chrysler and they said I needed to take my Jeep to a dealership for an official diagnostic test before they would make a decision. The dealership informed me that my heater core was already replaced in Jan. 2015 and likely needed to be replaced. The part was still under a Mopar warranty thankfully, but Mopar wanted the dealership to flush the heater core before they would authorize replacement of the part. Soooo, my heater core was flushed and now I have heat again. However, if this is a problem that results from casting sand build up (which the dealership mechanic said it was) won't this just happen again? In summary, at 11,000 miles the heater core was replaced. The new heater core needed to be replaced after 26,000 miles, but was flushed instead. I'm thinking of trading in the 2012 model for a newer one if this is a known problem with this year...

http://www.carcomplaints.com/Jeep/Wrangler/2012/AC_heater/heater_not_working.shtml (last visited on May 25, 2016):



**#15   Wrangler Sport 3.6L**
Automatic transmission   18,000 miles

2012 Wrangler Sport. No heat on the drivers side. After doing some research I learned that this is a common problem with the Wranglers and is likely caused because casting sand had not been sufficiently flushed from the engine block when manufactured. Coolant stirs up the casting sand and it then settles in the bottom of the radiator, heater core and overflow tank. The sediment in the heater core restricts coolant flow causing poor heating of the vehicle.

I checked my overflow tank and found about 3" of sand in the bottom. The service manager at the Jeep dealership said he did not have a recall, campaign or service bulletin on this and it would not be covered by Jeep. He said he'd not heard of the issue, but when he asked fellow service managers they had heard of it in older Wranglers. This is a pretty outrageous issue if you ask me. Nobody but Jeep dealers have serviced the vehicle, so where would significant amounts of sand-like residue come from to get into the cooling system?

Any feedback or help from the community would be appreciated.

http://www.carcomplaints.com/Jeep/Wrangler/2012/AC_heater/heater_not_working.shtml (last visited on May 25, 2016)

**#21   Wrangler Sahara 3.6L**
Automatic transmission   46,500 miles

Bought this used 2012 Jeep Wrangler Unlimited Sahara in September, 2016 from a dealer in Cincinnati, Ohio. I test drove the vehicle on a 88 degree day so I couldn't tell if the heater was working properly or not. After getting it home to northern Michigan and turning on the heater on the first cool fall day, I immediately noticed just cool air coming from the heating system on the driver's side. After paying for a heater core flush and a thorough evaluation by the Jeep dealer it was determined that the heater core was plugged. I was informed at that time that there was no recall on the heater core and the repair was not covered by warranty. With winter on the way, I had not choice but to fix it at a cost of $1,163. It seems based on many other stories like this, Jeep obviously had a supplier problem and should step up to the plate and cover these repairs.

http://www.carcomplaints.com/Jeep/Wrangler/2012/AC_heater/heater_not_working.shtml    (last visited on May 25, 2016)



http://www.wranglerforum.com/f202/heater-core-no-drivers-heat-and-casting-sand-388066.html
(Last visited on November 30, 2017)



http://www.wranglerforum.com/f202/heater-core-no-drivers-heat-and-casting-sand-388066.html
(Last visited on November 30, 2017)



**Heater Core, No Drivers Heat and Casting Sand**

I have a 2013 with 14,000 miles. The water pump was replaced in August at 9,600 miles due to the chirp.

I am currently getting blast furnace heat on the passenger side, Luke warm on the drivers side. I took it to the dealer today and they called, said it was fixed and blamed it on a sticky <u>actuator</u> in the duct work. When I arrived to pick it up, the problem was still there.

I explained the casting sand stories I have read on this forum and they said they would go ahead and replace the <u>heater</u> core tomorrow. They are expecting it to take two days because they have to pull the seats, console and dash. The A/C system also has to bled and then refilled.

http://www.wranglerforum.com/f202/heater-core-no-drivers-heat-and-casting-sand-388066.html
(last visited on May 25, 2017)



http://www.wranglerforum.com/f202/2013-discolored-coolant-610658-11.html
(last visited on November 30, 2017)

**NHSTA Complaints**

- NHSTA Complaint on November 09, 2017 for a 2013 Wrangler- "HEATER DOES NOT PRODUCE WARM AIR ON DRIVER SIDE OF VEHICLE THROUGH FLOOR, VENT, OR DEFROST. DRIVING SPEED DOES NOT AFFECT TEMPERATURE ON DRIVER SIDE. HEAT WILL SOMETIMES GET WARM ON DRIVER SIDE AFTER AN HOUR OF DRIVING. APPEARS TO BE RELATED TO STAR CASE S12307000008. THIS IS A WIDE SPREAD, KNOWN ISSUE, THAT IS VERY EXPENSIVE TO REPAIR. IT IS DANGEROUS AS WELL DUE TO ICE BUILD UP ON WINDSHIELD BECAUSE THERE IS NO DEFROST HEAT ON DRIVER SIDE"

- NHSTA Complaint on November 13, 2017 for a 2013 Wrangler- "JUST PURCHASED, HEAT NOT WORKING. HAD HEATER CORE FLUSHED, HEAT WORKED FOR ONE WEEK AND NOW BLOWS VERY HOT ON RIGHT SIDE AND LUKE WARM ON LEFT SIDE. THE SAME SYMPTOMS AS THE CASTING SAND PLUGGING THE HEATER CORE. I NOW HAVE TO TAKE BACK TO SHOP TO FLUSH HEATER CORE AGAIN. NOT GOOD."

- NHSTA Complaint on June 06, 2017 for a 2013 Wrangler- "THE VEHICLE HAS STOPPED BLOWING HOT AIR ON THE DRIVERS SIDE AND FEET, BUT WILL BLOW HOT AIR ON PASSENGERS SIDE. THIS LEADS TO ISSUES WITH DEFROSTING AND VISIBILITY."

- NHSTA Complaint on May 01, 2017 for a 2013 Wrangler- "THE VEHICLE HAS STOPPED BLOWING HOT AIR ON THE DRIVERS SIDE AND FEET BUT WILL BLOW HOT AIR ON PASSENGERS SIDE. THIS LEADS TO ISSUES WITH DEFROSTING AND VISIBILITY AS WELL AS THE DRIVER BEING SAFE AND ABLE TO FEEL THEIR FINGERS AND FEET WHILE DRIVING. I TOOK IT TO THE DEALER WHO SAYS THERE IS A STAR REPORT ON THIS ISSUE AND IT IS A WELL KNOWN ISSUE. JEEP HOWEVER SAYS I AM OUT OF WARRANTY SO THEY WILL NOT FIX IT. MY EXTENDED WARRANTY BOUGHT THROUGH THE DEALERSHIP SAYS THEY WILL NOT FIX IT. THE RADIATOR, HEATER CORE OVER FLOW TANK AND ALL OTHER RELATED COMPONENTS ARE THE RECOMMENDED REPAIR."

- NHSTA Complaint on January 03, 2017 for a 2013 Wrangler "TL* THE CONTACT OWNS A 2013 JEEP WRANGLER. UPON CHECKING THE VEHICLE'S COOLANT, THE CONTACT NOTICED ABNORMAL COLORED COOLANT. THE VEHICLE WAS TAKEN TO THE DEALER TO GET A COOLANT FLUSH WHERE IT WAS DIAGNOSED THAT THERE WAS CASTING SAND IN THE

COOLANT. THE VEHICLE WAS REPAIRED; HOWEVER, UPON RETURNING THE VEHICLE HOME, THE CONTACT INSPECTED THE COOLANT SYSTEM AND NOTICED THAT IT HAD BEEN CONTAMINATED BY SAND PARTICLES. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 28,000....UPDATED 03/08/17 *BF"

- NHSTA Complaint on January 02, 2017 for a 2012 Wrangler "FROM: CUSTOMER VEHICLE: 2012 JEEP WRANGLER SPORT, PURCHASED NEW IN 2012. REFERENCE: PROBLEMS IN HEATING SYSTEM TO WHOM IT MAY CONCERN, I PURCHASED A NEW 2012 JEEP WRANGLER SPORT FROM HENDRICK CHRYSLER JEEP IN FAYETTEVILLE, NC. FOURTEEN MONTHS LATER, I MOVED TO FLORIDA, WHERE THERE WAS NO NEED TO USE THE HEATER. UPON MY RETURN TO NORTH CAROLINA IN THE WINTER OF 2014, I NOTICED THAT HEATER ON THE DRIVER'S SIDE WAS NOT AS WARM AS THE PASSENGER'S SIDE. THE FOLLOWING WINTER, THE HEAT ON THE DRIVER'S SIDE FADED TO A POINT WHERE IT WAS BARELY WORKING. AFTER RESEARCHING THE ISSUE AND SPEAKING WITH A REPRESENTATIVE AT HENDRICK JEEP SERVICE CENTER, I LEARNED THAT THE HEATER CORE WAS LIKELY THE PROBLEM AND THAT I WOULD NEED TO FLUSH THE HEATER CORE. IN JANUARY 2015, I TOOK MY JEEP TO A PRIVATE MECHANIC TO HAVE THE HEATER CORE FLUSHED, WHICH FIXED THE PROBLEM FOR A SHORT TIME. RESEARCH ONLINE AMONG JEEP OWNERS OF MY MODEL AND YEAR REVEALED THAT THE LONG-TERM SOLUTION IS A NEW RADIATOR AND HEATER CORE (NEITHER OF WHICH ARE UNDER WARRANTY OR UNDER RECALL). THE POOR CLEANING AT THE TIME OF MANUFACTURING HAS CAUSED THE CASTING OF SAND IN THE HEATER CORE AND RADIATOR, RESULTING BUILD UP THAT BLOCKS HEAT. NOW, IN WINTER OF 2016, MY HEATER DOES NOT WORK. I CANNOT FIND A RECALL OR A REBATE FOR THE MORE THAN $2,400 DEALER ESTIMATE I RECEIVED TO REPLACE MY HEATER CORE AND RADIATOR. I FOUND A CHRYSLER STAR CASE (SEE ATTACHMENT) THAT GIVES STEPS TO FIX THE PROBLEM WITHOUT ACKNOWLEDGING ITS ORIGINS IN MANUFACTURING. I HAVE EMAILED CHRYSLER WITH A REQUEST FOR SUPPORT, TO NO AVAIL. GIVEN THAT THIS PROBLEM IS SO WIDESPREAD AND CONSISTANT AMONG JEEP OWNERS OF MY MODEL AND YEAR, I WANTED TO SHARE THE CASE WITH THE RECALL AGENCY, ALTHOUGH I KNOW THIS IS NOT A DIRECT "SAFETY ISSUE.""

- <u>NHSTA Complaint on August 08, 2016 for a 2013 Wrangler</u>-"2 ISSUES WITH MY 13 WRANGLER UNLIMITED 1ST ... ENGINE TEMP GETS UP TO ABOUT 80 PERCENT OF THE GUAGE. I HAVE HAD IT IN 3 TIMES THEY REPLACED THE WATER PUMP TWICE AND STILL SAME ISSUES. THEY HAVE REPLACE THERMOSTAT COOLANT FLUSH ECT. THE DEALER CONNOT FIND OUT WHATS WRONG. I HAVE RESORTED TO ADDING A SECONDARY COOLANT FAN AND IT HELPS A BIT BUT ITS STILL A PROBLEM IVE HAD SINCE A YEAR FATER BUYING IT. 2ND ... THE TRANSMISSION(AUTOMATIC) WHEN GOING UP ANY KIND OF INCLINE IT DOES NOT WANT TO SHIFT UNTILL ABOUT 6K RPMS. I HAVE HAD IT IN FOR THIS ALSO AND DEALER CLAIMS NOTHING THEY CAN FIND."

- <u>NHSTA Complaint on December 12, 2016 for a 2011 Wrangler</u>-"THE HEATER IN MY JEEP HAS NEVER WORKED SINCE WE BOUGHT IT! THE DRIVER SIDE ESPECIALLY! WE TOOK IT BACK WHERE WE BOUGHT IT AND THEY SAID THE VENT WAS STUCK AND IT JUST CONTINUES TO GET WORSE NOW ITS FREEZING. ONLINE THE INTERNET IS BLOWING UP W/ PEOPLE W/ THE SAME ISSUES WITH THESE. VEHICLES. WHY IS THERE NOT A RECALL? THIS SHOULD BE A CLASS ACTION LAWSUITE IF YOU DO NOT TAKE CARE OF THIS ASAP!"

- <u>NHSTA Complaint on November 07, 2016 for a 2014 Wrangler</u>-"FOR MONTHS I SMELLED ANTIFREEZE FROM THE FRONT OF THE JEEP BUT THERE WERE NO LEAKS . AFTER A MONTH I FOUND DRIED ANTIFREEZE ON THE BOTTOM OF THE RADIATOR PASSENGER SIDE . THE JEEP WAS UNDER WARRANTY AND WAS REPAIRED BY DEALER . MY FRIEND ALSO WITH A NEW 2014 WRANGLER ALSO HAD SAME PROBLEM . THANK YOU JOEY"

- <u>NHSTA Complaint on August 16, 2017 for a 2013 Wrangler</u> HAVING PROBLEMS WITH MY HEATER CORE AND RADIATOR BECOMING CLOGGED I HAVE HAD THEM BOTH FLUSHED BY THE DEALERSHIP SEVERAL TIMES AND THEY STILL CLOG CAUSING HAZARDOUS DRIVING IN THE WINTER TIME WITH NO DEFROSTERS OR HEAT TO SAFELY DRIVE TO WORK

- <u>NHSTA Complaint on August 16, 2017 for a 2013 Wrangler</u>-"TL* THE CONTACT OWNS A 2012 JEEP WRANGLER. THE CONTACT STATED THAT THE COOLING SYSTEM STOPPED WORKING AND THE CHECK ENGINE LIGHT ILLUMINATED. THE VEHICLE WAS TAKEN TO A LOCAL DEALER WHERE IT WAS DIAGNOSED THAT THERE WAS CASTING SAND IN THE COOLING SYSTEM, WHICH CLOGGED UP THE RADIATOR, THE

WATER PUMP, OIL COOLER, HEATER CORE, AND THE COOLING PART OF THE ENGINE. THE DEALER STATED THAT ALL THE CLOGGED PARTS NEEDED TO BE REPLACED. THE MANUFACTURER WAS MADE AWARE OF THE ISSUE AND STATED THAT THE PARTS WERE NOT COVERED BY THE WARRANTY AND THAT THERE WAS NO RECALL. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS 62,000."

- NHSTA Complaint on March 03, 2016 for a 2012 Wrangler -"I TOOK MY 2012 JEEP INTO A DEALER SPIRIT DODGE IN SWEDESBORO NJ 08085 SATURDAY 2/27/16 MY COMPLAINT WAS NO HEAT. I WAS TOLD IT NEEDS A HEATER CORE A RADIATOR, AND TRANS COOLER. AND THAT MY EASY CARE EXTENDED WARRANTY DID NOT COVER IT EVEN THOUGH IT SAYS IT COVERS HEAT. MY EASY CARE CONTRACT NUMBER IS EGTK886782. MY JEEP HAS 52000 MILES. THEY SAID IT HAS SLUDGE IN THE SYSTEM. NOW MY SYSTEM IS NOT SCHUELDED TO BE CLEANED FLUSHED TILL 60 MONTH. SO IT FAILED BEFORE THE TIME. I WAS TOLD IT'S A KNOW PROBLEM BUT THEY HAVE NOT RECALLED THEM. I BOUGHT THE JEEP AT VANN DODGE IN VINELAND NJ. SO I REALLY FEEL CHEATED. I HAVE HAD NO HEAT FOR A WHILE BUT I DIDN'T REPORT RIGHT AWAY"

- NHSTA Complaint on May 05, 2015 for a 2012 Wrangler"I HAVE A 2012 JEEP WRANGLER UNLIMITED WITH 40K MILES. AROUND 15K MILES, I STARTED EXPERIENCING ISSUES WITH THE DRIVER SIDE AND FRONT WINDSHIELD HEATING/DEFROSTING NOT WORKING. HEATING WORKS ON THE PASSENGER SIDE, BUT NOT ON THE DRIVERÂ       SIDES SEATING OR WINDSHIELD AREAS. THIS ISSUE CREATES A COMFORT PROBLEM DURING COLD DAYS DUE TO NO HEAT ON THE DRIVERÂ       SIDEÂ       ¦ BUT MORE IMPORTAT CREATES A SAFETY ISSUE BECAUSE THE FRONT WINDSHIELD DOES NOT DEFROST PROPERLY WITHOUT SUFFICIENT HEAT, CREATING UNSAFE DRIVING SCENARIOS. THIS ISSUE WAS INTERMITTENT AT FIRST, BUT OVER THE PAST 20K MILES HAS BECOME A FREQUENT COMFORT AND SAFETY ISSUE. THIS DEFECT/ISSUE/DESIGN FLAW IS A KNOWN PROBLEM WITH THE CURRENT WRANGLER UNLIMITED AS A NUMBER OF OTHERS I KNOW WITH THE SAME VEHICLE EXPERIENCE THIS ISSUE AND YOU CAN FIND ENDLESS COMPLAINTS OF THE ISSUE ON LINE. MY DEALER ALSO EXPLAINED THEY RECEIVE FREQUENT COMPLAINTS FOR THIS PROBLEM. I BROUGHT MY JEEP TO THE DEALERSHIP. THEY EXPLAINED I NEED THE HEATING CORE

REPLACED, AND DUE TO ITS LOCATION BEHIND THE DASHBOARD WILL COST ME $1000+ TO REPAIR, PRIMARILY DUE TO THE LABOR REQUIRED TO PULL OFF THE DASHBOARD AND OTHER CAR PARTS TO REACH AND REPLACE THE HEATING CORE. THIS ISSUE SHOULD BE A RECOGNIZED SAFETY RECALL OR SERVICE BULLETIN BY JEEP/CHRYSLER WITH NO OUT OF POCKET REPAIR EXPENSE FOR THE VEHICLE OWNERS WHO EXPECT TO RECEIVE SAFE, HIGH QUALITY, WELL DESIGNED PRODUCTS FROM JEEP/CHRYSLER."

- <u>NHSTA Complaint on February 02, 2015 for a 2012 Wrangler</u>-"VEHICLE HAS NO HEAT ON DRIVER SIDE VENT AND FLOOR VENTS, COLD AIR COMES OUT AS IF THE A/C IS ON. AS TIME HAS PASSED COOL AIR ON FRONT WINDOW DEFROSTER AS WELL AS CENTER AND PASSENGER VENTS. VEHICLE IS WARMED UP WHEN TRYING TO TURN HEAT ON WITH NO POSITIVE RESULTS. ONLINE JEEP FORUMS LIST THIS AS A PROBLEM TO JEEP WRANGLERS. DEALERSHIP STATED THEY ARE UNAWARE OF THIS PROBLEM. THIS IS A SAFETY ISSUE TO DEFROST WINDOWS FOR VISIBILITY, AND SHOULD BE A RECALL. VEHICLE IS ALMOST 3 YEARS OLD. *TR"

- <u>NHSTA Complaint on October 21, 2015 for a 2012 Wrangler</u>-"MY CAR WAS MANUFACTURED WRONG... MY ENGINE BLOCK IS CASTING SAND INTO MY COOLANT SYSTEM WHICH THEN BLOWS OUT MY HEATER CORE AND RADIATOR. I HAVE SPENT 5 MONTHS UNDER WARRENTY TRYING TO FIX WITH ISSUE BUT THE JEEP DEALER AND CHRYSLER GIVE ME THE RUN AROUND. I WAS TRYING TO GET THIS FIX UNDER WARRENTY BUT ALL THE RUN AROUND I GOT FROM THE DEALERS HAS CAUSED MY WARRANTY TO EXPIRE WITH NO FIX. I THINK I HAVE BOUGHT A LAMON OF A CAR I ONLY HAVE 14K MILES , MY ISSUE STARTED AT 7K MILES. NOW IT IS WINTER TIME AND IN DRIVING MY CAR WITH NO HEAT. I HAVE A NEW BORN BABY ON THE WAY WHO WILL GET SICK INSIDE MY CAR. JEEP DOES NOT WANT TO COVER THE COST OF MY REPAIRS TO REPLACE THE HEATER CORE AND RADIATOR ALSO A COMPLETE FLUSH OF THIS SAND COMING FROM THE ENGINE. THIS IS A HAZARD FOR ME AND MY BABY TO DRIVE AROUND IN THIS COLD VEHICLE . THIS IS A KNOWN PROBLEM BUT JEEP\CHRYSLER IS TRYING THEIR BEST TO KEEP THIS QUIET. ILL BE TRYING TO CONTACT A LAWYER SOON OR MAYBE A NEWS STATION."

- <u>NHSTA Complaint on April 10, 2015 for a 2012 Wrangler</u>-"AT THE BEGINNING OF WINTER I NOTICE THE DEFROST/HEAT IN THE

JEEP WAS NOT PUTTING OUT A LOT OF HEAT. IT WOULD BARELY DEFROST THE WINDSHIELD. WITH THE FRIGID WEATHER WE HAVE HAD, I JUST HAD IT CHECKED. I WAS TOLD THE HEATER CORE, AND THE RADIATOR WOULD NEED CHANGED BECAUSE THEY WERE PLUGGED. I FEEL SORRY FOR ANYONE THAT OWNS A CHRYSLER PRODUCT. THIS STILL DOES NOT RUN RIGHT AFTER THE HEAD WAS CHANGED, NO DUMMY LIGHT COMES ON, SO NONE OF THE MECHANICS WILL BELIEVE ME THAT IT IS NOT RIGHT. AS YOU CAN SEE BY THE MILEAGE IT IS OUT OF WARRANTY, THE ISSUES STARTED RIGHT AFTER I BOUGHT IT. IT IS NOT THE DEALERSHIPS FAULT, IT IS THE COMPANY. DO SOMETHING TO GET THE ISSUES FIXED! *TR."

- NHSTA Complaint on December 03, 2014 for a 2012 Wrangler- "VEHICLE STOPPED GETTING HEAT FROM ALL VENTS ON DRIVERS SIDE, INCLUDING DEFROSTER AND ONLY LUKE WARM HEAT ON THE PASSENGER SIDE. ALL REGULAR MAINTENANCE HAD BEEN PERFORMED ON THE VEHICLE. DEALER SAYS RADIATOR AND HEATER CORE NEED TO BE REPLACED AS THEY ARE FILLED WITH 'SLUDGE'. A LITTLE RESEARCH ONLINE AND THIS SEEMS TO BE AN ALL TO COMMON ISSUE WITH THESE JEEPS AND CHRYSLER HAS GIVEN NO ANSWER AS TO THE CAUSE. WHILE NOT HAVING HEAT IS INCONVENIENT, NOT BEING ABLE TO DEFROST THE WINDSHIELD IS A SAFETY HAZARD. THEY ARE CURRENTLY FIGHTING ME ON PAYING FOR THIS AS THE VEHICLE IS JUST OUT OF WARRANTY. THIS IS AN ISSUE CHRYSLER IS FULLY AWARE OF AND HAS DONE NOTHING TO FIX! FURTHER INVESTIGATING HAS SHOWN THAT IGNORING THIS PROBLEM AND NOT REMOVING THIS SLUDGE COULD EVENTUALLY LEAD TO ENGINE FAILURE. *JS"

- NHSTA Complaint on January 24, 2014 for a 2012 Wrangler- "DRIVING & NOTICE THAT WINDOW STARTED TO FROST UP, AT THE SAME TIME NOTICE THAT THE HEAT WAS NOT GETTING WARM AFTER DRIVING FOR OVER 20 MINS. TURNED THE DEFROST ON AND IT STARTED TO FROST MORE, PUT MY HAND TO THE BLOWERS & NOTICE THAT IT WAS BLOWING COOL AIR. DOUBLE CHECKED THAT I HAD THE HEAT ON AND PUT IT TO HIGH AND IT CONTINUED TO BLOW COOL AIR,REACHED OVER TO THE PASSENGER SIDE AND IT WAS BLOWING WARM AIR. MADE AN APPOINTMENT TOOK MY VEHICLE IN AS IT ALREADY HAD A RECALL ON IT FOR SOMETHING ELSE EXPLAIN TO THEM WHAT WAS GOING ON WITH THE HEATER, THEY SAID THAT THE PART FOR MY HEATER WOULD TAKE 2 DAYS TO GET IN & THEY WOULD

CALL. ONE WEEK LATER HAD NOT HEARD ANYTHING, WENT BACK TO THE JEEP DEALERSHIP(COLORADO CHRYSLER JEEP) SERVICE & ASKED ABOUT THE PART, WAS TOLD THAT IT WAS NOTHING PUT IN OR SHOWN ABOUT MY COMPLAINT ABOUT MY HEATER.SET R ANOTHER APPOINTMENT TO BRING MY JEEP IN TO HAVE THE HEATER REPAIRED & WAS TOLD IT WOULD TAKE 4 HOURS, AFTER BEING THERE FOR OVER AN HOUR THEY SAID IT WAS GOING TO BE A 2 DAY REPAIR...IT WAS A RECALL BUT NOT A RECALL & THAT THEY WOULD BE REPLACING THE RADIATOR AND HEATER CORE. APPOINTMENT FOR 1/3/14 AND WAS TOLD IT WOULD BE READY ON 1/6/ OR 1/7/14. MY JEEP WAS NOT READY UNTIL 1/22/14 AND WHEN I PICKED IT UP ON 1/23/14 THEY TOLD ME THEY THE FLUSHED HEATER CORE, RADIATOR AND OVERFLOW TANK...FLUSHED ENTIRE SYSTEM FILLED AND BLEED SYSTEM WITH NEW COOLANT AND CHECKED TEMP AT 155 DEGREES. THAT SHOULD FIX IT AND IF IT DID NOT THEN THEY WOULD REPLACE THE RADIATOR AND HEATER CORE. THEN GOT IN THE JEEP LET IT RUN FOR OVER 8 MINS HEATER ON LEFT SIDE WAS STILLING BLOWING COOL AND RIGHT WAS BLOWING WARM. TOOK OVER 18 MINS FOR THE LEFT SIDE TO BLOW WARM BUT WAS NOT AS WARM AS RIGHT SIDE. TAKING JEEP TO DIFFERENT JEEP DEALERSHIP SERVICE DEPARTMENT TOMORROW AS THE SERVICE SIMPLY SHOW THAT THEY DID NOT DO THE JOB THEY SHOULD HAVE. *TR"

## CHRYSLER'S EXPRESS WARRANTIES COVER THE DEFECT

35.    Chrysler provides warranties for the class vehicles' engine blocks that cover the Defect, including (among others), a "New Vehicle Limited Warranty" that provides "bumper to bumper coverage for 3 years or 36,000 miles"; and a "Powertrain Limited Warranty" that provides coverage for the engine block for "5 years or 100,000 miles." Under these and other warranties, Chrysler promised to repair or replace engine and other components arising from defects in materials or workmanship, including the Defect, at no cost to Class members.

36.    The Powertrain Limited Warranty covers the gasoline engine and the cylinder block, also known as the engine block. The engine cylinder block and all internal parts; cylinder head assemblies; timing case, timing chain, timing belt, gears and sprockets; vibration damper oil

pump; water pump and housing; intake and exhaust manifolds; flywheel with starter ring gear; core plugs; valve covers; oil pan; turbocharger housing and internal parts; turbocharger wastegate actuator; supercharger; serpentine belt tensioner; and seals and gaskets.

37.     Chrysler's warranties appear in window labels on the vehicles, in the owner's manuals and brochures, and on the company's websites.

## PLAINTIFFS' EXPERIENCES

### John Malizia

38.     In April, 2013, John Malizia purchased a new 2013 Jeep Wrangler from then Chrysler Dodge Jeep of Newburgh in Newburgh, New York. Like all Chrysler vehicles, Mr. Malizia's vehicle came with Chrysler's Limited Warranty and Powertrain Limited Warranty.

39.     At the time of his purchase, Mr. Malizia was never informed in any way by Defendant that his class vehicle contained the Defect.  He has performed normal and routine maintenance on his vehicle.

40.     In February 2017, with approximately 85,000 miles on his vehicle, Mr. Malizia attempted to use the heat in his class vehicle. His class vehicle only emitted lukewarm air on the driver's side of the vehicle despite the heat being set to the warmest setting; however, the passenger's side emitted very warm air when the heat was set to the highest setting. This condition persists in Mr. Malizia's vehicle today.

41.     On April 21, 2017, frustrated with his class vehicle's heating issues during a cold winter, Mr. Malizia went to Hudson Valley Chrysler Dodge Jeep for an inspection. Upon inspection, Mr. Malizia was told the heater core in his vehicle needed to be replaced. He was told it would take 9 hours of labor and the part would cost $250.  The Chrysler dealership told Mr. Malizia it would cost him $1,300.00 to replace his class vehicle's heater core.

42.     Thereafter, Mr. Malizia contacted his insurance company, Zurich, to see if he could be reimbursed for the expensive repair. Zurich informed Mr. Malizia that if his class vehicle's heater core was clogged, they would not reimburse him for the cost of repair. However, they

informed him if his class vehicle's heater core was broken, they would reimburse him for the entirety of the cost to replace the heater core.

43.     Hudson Valley Chrysler Dodge Jeep informed Mr. Malizia that they could only diagnose his class vehicle's heater core as being clogged by removing and inspecting the part. Thus, if his heater core was clogged with sediment rather than broken, he would be responsible for the entire $1.300.00 heater core replacement. Unwilling to take the risk of a repair he could not afford, Mr. Malizia instructed technicians at Hudson Valley Chrysler Dodge Jeep to not perform the repair.

44.     Hudson Valley Chrysler Dodge Jeep never disclosed to Mr. Malizia that the Defect damages the radiator, oil cooler, and heater core, as explained herein. In addition, Hudson Valley Chrysler Dodge Jeep did not replace nor repair the engine or engine components in which the sludge accumulates as a result of Chrysler's production processes. Because the defect was present at the point of sale and was not disclosed to Mr. Malizia, he did not receive the benefit of his bargain as he either would not have purchased the vehicle if he had been advised of the defect or he would have paid less for it than he did.

45.     Currently, Mr. Malizia's class vehicle has 94,000 miles and he continues to use the vehicle with lukewarm heating on his driver's side.

**<u>Mark Pustulka</u>**

46.     In fall 2013, Mark Pustulka purchased a used 2013 Jeep Wrangler Sport with 17,000 miles on it at the time of purchase for personal and family use. He purchased the vehicle from Keller Chevrolet, in Erie County, New York. Like all Chrysler vehicles, Plaintiff's class vehicle came with Chrysler's Limited Warranty and Powertrain Limited Warranty, both of which were in effect at the time of his purchase. Before or after his purchase, he was never informed in any way by Defendant that his class vehicle contained the Defect.

47.     After purchasing the vehicle, Mr. Pustulka performed normal and routine maintenance on it.

48.     In late October 2013 with approximately 18,000 miles on the vehicle, due to the cold weather, Mr. Pustulka attempted to use the heat in his class vehicle, but it emitted only lukewarm air from the vents despite the heat being set to the warmest setting. This condition continued during the entire operation of the vehicle on that occasion and other times going forward.

49.     In late October 2016, with approximately 47,000 miles on his vehicle, Mr. Pustulka again noticed his class vehicle only emitted lukewarm air from the vents despite being set to the warmest setting. Buffalo, New York where he lives experienced a colder than normal winter in late 2016 and early 2017, so he was often forced to drive his class vehicle with marginal visibility due to the Defect.

50.     On May 27, 2017, with 46,371 miles on the odometer, he took his class vehicle to Northtown Chrysler Dodge Jeep Ram ("Northtown") in Tonawanda, New York[5] to be repaired. Mr. Pustulka was informed that a failed heater core was the cause behind the inhibited heat function in his class vehicle. In addition, he was told the class vehicle needed to be flushed in order to properly fix the heating issue. Upon information and belief, unknown to Mr. Pustulka, a sludge-like, gunk residue had been building up in the radiator for a number of years.

51.     Mr. Pustulka was informed that the heater core was plugged and would need to be replaced. Mr. Pustulka was also informed that the repair was not covered under warranty because the repairs were outside the 3-year/36,000 mile warranty and was not covered under the 5-year/100,000 mile powertrain warranty.

52.     Mr. Pustulka was quoted $1,573.05 by Northtown Jeep to replace the heater core and flush his class vehicle.  Mr. Pustulka objected to and refused to pay this amount for the repair. Northtown Jeep never disclosed that the Defect damages the radiator, oil cooler, and heater core, as explained herein.

53.     Northtown did not replace or repair the engine or engine components in which the sludge accumulates as a result of Chrysler's production processes. Because the defect was present

---

[5] Northtown Chrysler Dodge Jeep Ram is an authorized Chrysler Dealership.

at the point of sale and was not disclosed to Mr. Pustulka, he did not receive the benefit of his bargain as he either would not have purchased the vehicle if he had been advised of the defect or he would have paid less for it than he did.

54.     Currently, Mr. Pustulka has 53,850 miles on his vehicle and continues to use the vehicle without any heat.

**Stephanie and Richard Malec**

55.     On May 26, 2015, Stephanie and Richard Malec ("the Malecs") purchased a used 2013 Jeep Wrangler from then Genesee Valley Chrysler Dodge Jeep in Avon, NY with approximately 32,000 miles on the vehicle. Like all Chrysler vehicles, the Malec's vehicle came with Chrysler's Limited Warranty and Powertrain Limited Warranty. The Malecs were never informed in any way by Defendant that their class vehicle contained the Defect.

56.     The Malecs have performed normal and routine maintenance on their vehicle.

57.     In February 2017, the Malecs noticed that the heating performance had deteriorated in their vehicle. Only lukewarm air emitted on the driver's side of the vehicle when the heat was set to the warmest setting, while the passenger's side emitted very warm air. More recently, the heat has completely ceased functioning in the vehicle.

58.     Frustrated with the lack of heat in the vehicle, on October 27, 2017, Richard Malec took the vehicle to Genesee Valley Chrysler Dodge Jeep ("Genesee Valley") for an inspection. Upon arriving at Genesee Valley, Mr. Malec asked for an engine flush of his class vehicle. Service technicians told him they did not have the equipment and could not perform the flush. The service technicians at Genesee Valley also told Mr. Malec the heater core would need to be replaced in his vehicle. Mr. Malec and the repair would cost about $1568 plus tax. In addition, Mr. Malec was told the repair would not be covered under either the Basic Limited Warranty or Powertrain Warranty. Mr. Malec was charged $45 dollars for his visit.

59.     Immediately thereafter on November 10, 2017, Mr. Malec took his vehicle to a different mechanic who attempted to flush of the heater core in the vehicle. Upon inspection, his mechanic was not able to flush the heater core, and told Mr. Malec the issue was more extensive

than he originally thought. The mechanic recommended the Malecs return to a Chrysler dealership to have it evaluated.  That mechanic charged him $40.50 to attempt the flush.

60.     In approximately early November 2017, frustrated the required heater core repair in his vehicle was not covered under either the Basic Limited Warranty or Powertrain Warranty that accompanied his vehicle, Mr. Malec called Chrysler Jeep's corporate customer service. He spoke to a customer service representative named Angela. In response to Mr. Malec's complaints regarding the issues with his vehicle, Angela instructed Mr. Malec to seek a dealer discount for replacement of his heater core in his vehicle from Genesee Valley.

61.     When he called Genesee Valley, he was informed that they could replace the heater core within his class vehicle for $1200.00 plus tax.

62.     Not satisfied with this quote, Mr. Malec again called Jeep Customer Service and spoke again to Angela. While speaking to Angela, Mr. Malec expressed both his dissatisfaction with the lack of heat in his vehicle and that Genesee Valley Chrysler Dodge Jeep quoted him $1200.00 plus tax to replace the heater core within his vehicle. In response, Angela told Mr. Malec that since had had already received a dealer discount from Genesee Valley, there was nothing else she could do. When Mr. Malec asked for Angela's supervisor, he was told he would be contacted by her supervisor at a later time.

63.     On November 7, 2017, Kaitlyn, a supervisor at Chrysler Jeep customer service, contacted Mr. Malec. Again, Kaitlyn offered Mr. Malec a price of $1,200.00 plus tax to have the heater core in his vehicle replaced. Further, Kaitlyn told Mr. Malec that "if he had brought the vehicle in for a repair closer to the start of the problem, even if the vehicle was out of warranty, it could have been a different story." Mr. Malec explained that when the vehicle was having issues in February 2017, it was not readily apparent the vehicle was having inhibited heating issues due to the springtime weather. Mr. Malec explained it was not until September, when the weather started to get cold, that he and his daughter noticed full extent of the problem.

64.     Neither Genesee Valley nor Jeep's customer service representatives ever disclosed that the Defect damages the radiator, oil cooler, and heater core, as explained herein. In addition,

neither Genesee Valley nor Jeep customer service representatives offered to replace or repair the engine or affected engine components at no cost to the Malecs. Because the defect was present at the point of sale and was not disclosed to the Malecs by Defendant, they not receive the benefit of their bargain as they would have either not purchased the vehicle or would have paid substantially less for it than they did.

65.     Currently, the Malecs have 53,400 miles on their vehicle and continue to use the vehicle without any heat.

**Domenick Frandina**

66.     In September 2012, Domenick Frandina ("Mr. Frandina") purchased a new 2012 Jeep Wrangler from Garden City Jeep in Hempstead, New York. Like all Chrysler vehicles, Mr. Frandina's vehicle came with Chrysler's Limited Warranty and Powertrain Limited Warranty. Upon purchase, the heating within Mr. Frandina's vehicle when set to the highest setting produced hot air evenly to both the driver's and passenger's side of his class vehicle.

67.     Thereafter, the Mr. Frandina performed normal and routine maintenance on his vehicle. Further, Mr. Frandina was never informed in any way by Defendant that his class vehicle contained the Defect.

68.     In early August 2017 with about 19,000 miles on his vehicle, Mr. and his wife went on a ride in his class vehicle. Mr. Frandina attempted to use the heat in his class vehicle. Despite his heat being turned to the highest setting, no heat emitted from either the driver's side of the vehicle, while lukewarm heat emitted from the passsenger's side.

69.     Immediately thereafter, Mr. Frandina placed calls to Westbury Jeep Chrysler Dodge RAM in Long Island, New York and Garden City Jeep. He asked if there was any recall regarding his 2012 Wrangler related to heating and air conditioning issues. Both dealerships informed Mr. Frandina that there was no recall that involved heating and air components.

70.     Frustrated, on August 28, 2017, with 19,934 miles on his vehicle, Mr. Frandina took his vehicle to Garden City Jeep for an inspection. Upon inspection, the service advisors at Garden City Jeep recommended that Mr. Frandina have his radiator flushed and replace his air

conditioning actuator. Further, Mr. Frandina was told that neither his Basic Limited Warranty nor Powertrain Limited Warranty would cover these repairs. In total, Mr. Frandina paid $483.83 out of pocket for these repairs.

71.     Neither Westbury Jeep Chrysler Dodge RAM, nor Garden City Jeep ever disclosed that the Defect damages the radiator, oil cooler, and heater core with his class vehicle, as explained herein. In addition, Westbury Jeep Chrysler Dodge RAM, nor Garden City Jeep did not offer to replace or repair the engine or affected engine components that are the source of the aforementioned problems at no cost to Mr. Frandina. Because the defect was present at the point of sale and was not disclosed to Mr. Frandina by Defendant, he has not received the benefit of his bargain as he would have either not purchased the vehicle or would have paid substantially less for it than he did.

72.     Currently, Mr. Frandina has 21,000 miles on his vehicle and continues to have minimal heating in his class vehicle. Namely, despite his heating being set to the highest setting, his class vehicle emits heat at a lower heat temperature on both the driver's and passenger's side of his class vehicle.

**Christopher Zimmermann**

73.     In July 2016, Christopher Zimmermann ("Mr. Zimmermann") purchased a used 2013 Jeep Rubicon Unlimited Wrangler from The Luxury Haus in Leonia, New Jersey with approximately 32,500 miles on the vehicle. Like all Chrysler vehicles, Mr. Zimmermann's vehicle came with Chrysler's Limited Warranty and Powertrain Limited Warranty. Upon purchase, the heating within Mr. Zimmermann's vehicle when set to the highest setting produced hot even air on both the driver's and passenger's side of his class vehicle.

74.     This past summer, Mr. Zimmermann was driving his class vehicle one evening when he attempted to use the heat in his class vehicle. Despite turning the heat to the highest setting, no air emitted from the vents on the driver's side while lukewarm air emitted from the vents on the passenger's side of his class vehicle.

75.      Frustrated, Mr. Zimmermann took his vehicle to Smith Haven Chrysler Jeep Dodge Ram in St. James, New York for an inspection. Upon inspection, service technicians determined that a sludge build up in the heater core was "choking his heat" and recommended that his heater core needed to be replaced along with his radiator, and oil cooler, or his heater core needed to be flushed. Mr. Zimmermann was quoted approximately $3,000 to replace the heater core, oil cooler, and radiator within his class vehicle. Mr. Zimmermann was quoted approximately $200 to have his heater core flushed. Mr. Zimmermann was told that neither his Basic Limited Warranty nor the Powertrain Warranty that accompanied his class vehicle would cover the cost of either quoted repair.

76.      The service technician at Smith Haven Chrysler Jeep Dodge Ram told Mr. Zimmermann that a sludge like build up in a heater core is a known problem with Jeep Wrangler models of Mr. Zimmermann's model year. Further, Mr. Zimmermann was told the flush would only temporarily "fix" the problem. Namely, service technicians told Mr. Zimmermann that there was a likelihood the sludge would return in a few months, and another flush of his heater core would be required to remove the sludge again. Given the expensive nature of complete heater core, radiator, and oil cooler replacement, Mr. Zimmermann opted to have his heater core flushed and paid approximately $200 dollars for the flush.

77.      Smith Haven Chrysler Jeep Dodge Ram never disclosed that cause of the Defect that damaged the radiator, oil cooler, and heater core within his class vehicle, as explained herein. In addition, Smith Haven Chrysler Jeep Dodge Ram did not offer to replace or repair the engine or affected engine components that are the source of the aforementioned problems at no cost to Mr. Zimmermann. Because the defect was present at the point of sale and was not disclosed to Mr. Zimmermann by Defendant, he has not received the benefit of his bargain as he would have either not purchased the vehicle or would have paid substantially less for it than he did.

78.      Currently, Mr. Zimmermann has approximately 46,000 miles on his vehicle and continues to have inhibited heating in his class vehicle.

## CLASS ALLEGATIONS

79.     At the time of Plaintiffs' and the Class Members' purchases, Chrysler failed to disclose the consumer complaints, malfunctions, safety hazards, and material facts related to the class vehicles' Defect and the Affected Components.

80.     Before Plaintiffs purchased their class vehicles, Plaintiffs were never informed of, or aware of, the class vehicles' Defect and the Affected Components.

81.     Had Chrysler disclosed the defect, Plaintiffs would not have purchased the class vehicles or would have paid significantly less for them. Plaintiffs were denied information material to their purchase and willingness to use the class vehicle.

82.     Due to the Defect, the value of the Jeeps at the time or purchase or lease was less than the amounts Class members paid.

83.     The Defect causes the Jeeps to lose value, including trade-in and re-sale value.

84.     The Defect causes Class members to face extensive repair costs, spend excessive time and burden arranging and obtaining repairs, and to lose use and enjoyment of the Jeeps.

## PROPOSED CLASS

85.     Plaintiffs bring this case as a class action under Fed. R. Civ. P. 23(b)(2) and/or 23(b)(3) on behalf of the following Class:

**Nationwide Class.** All persons who purchased or leased a 2012-2017 Chrysler Jeep Wrangler in the United States.

86.     Plaintiffs bring this case on behalf of the following state-wide Subclass:

**New York Subclass.** All persons who purchased or leased a 2012-2017 Chrysler Jeep Wrangler in the State of New York.

## CLASS CERTIFICATION ALLEGATIONS

87.     **Numerosity.** The Class and the New York Subclass is comprised of thousands of Chrysler Jeep Wrangler owners throughout the United States and within New York, making joinder impossible.

88.     **Commonality.** Questions of law and fact exist that are common to all Class and Subclass Members, and predominate over any questions that affect only individual Class and Subclass Members, including (among others):

a.      Whether Model Year 2012-2017 Jeep Wranglers engines suffer from a Defect;

b.      Whether the Defect causes damage to the Affected Components;

c.      Whether the Defect existed at the time of the manufacture of the class vehicles;

d.      Whether Chrysler knew or should have known about the Defect

e.      Whether Chrysler failed to disclose the Defect at the time that Class and Subclass Members purchased the class vehicles or thereafter;

f.      Whether Chrysler breached its express warranties by refusing to repair the Defect;

g.      Whether Chrysler's failure to disclose the Defect constitutes an unfair and deceptive act or practice in violation of New York General Business Law Section 349;

h.      Whether Chrysler acted or refused to act on grounds generally applicable to the Class and Subclass, thereby making the award of equitable relief appropriate to the Class and Subclass as a whole;

i.      Whether Chrysler's conduct violates state law pursuant to Magnuson-Moss Warranty Act.

j.      Whether the Defect impairs the value of the Jeeps;

89.     **Typicality.** Plaintiffs' claims are typical of the claims of Class and Subclass Members;

90.     **Adequate Representation.** The Plaintiffs are adequate representatives of the Class.

91.   **Superiority.** A class action is a superior method for adjudicating the claims at issue in this case and class-wide adjudication can be efficiently managed.

92.   **Predominance.** This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members.

93.   Class-wide injunctive, declaratory, or equitable relief is appropriate.

### TOLLING OF STATUTE OF LIMITATIONS

94.   **Active Concealment Tolling.** Any statutes of limitations are tolled by Chrysler's knowing and active omission of the fact that the engine, and all related engine components suffered from an extremely latent defect. Chrysler kept Plaintiffs and all Class and Subclass Members ignorant of vital information essential to the pursuit of their claims, without any fault or lack of diligence on the part of Plaintiffs. The details of Chrysler's efforts to omit its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and the Class and Subclass Members. Plaintiffs could not reasonably have discovered the fact that the engine, and all related engine components suffered from a defect that would cause repeated and significant failures.

95.   **Estoppel.** Chrysler was and is under a continuous duty to disclose to Plaintiffs, as well as Class and Subclass Members, the true character, quality, and nature of engines, and all related engine components. At all relevant times, and continuing to this day, Chrysler knowingly, affirmatively, and actively misrepresented and omitted the true character, quality, and nature of the problems caused by sand-residue to consumers and the public at large. The details of Chrysler's efforts to omit its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class and Subclass Members. Plaintiffs and Class and Subclass Members reasonably relied upon Chrysler's knowing and/or active omissions. Based on the foregoing, Chrysler is estopped from relying upon any statutes of limitation in defense of this action.

96.     **Equitable Tolling.** Chrysler took active steps to omit the fact that it wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold, and/or leased the class vehicles with the problems caused by sand-residue, and a multitude of other contaminates, to external or operator factors. The details of Chrysler's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class and Subclass Members. When Plaintiffs learned about this material information, they exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims. Chrysler wrongfully omitted its deceitful acts described above. Should it be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

97.     Given Chrysler's active and knowing concealment of the Defect, and the company's false and misleading statements attributing the problems caused by sand-residue, and a multitude of other contaminants, to external or operator factors, equitable tolling of the statutes of limitations or repose applicable to the causes of action brought in this case is appropriate.

98.     Plaintiffs and Class members could not have reasonable discovered the true reasons for the Defect until the recent investigation which led to the filing of this Complaint.

### FIRST CAUSE OF ACTION
**Breach of Express Warranties**
**(On Behalf of the Nationwide Class or, in the alternative, the New York Subclass)**

99.     Plaintiffs, on behalf of the Class or, in the alternative, the York Subclass, incorporate all of the foregoing allegations into this cause of action.

100.     Chrysler expressly warrantied that it would cover the cost of all parts and labor needed to repair any item on the vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation.

101.     Namely, Chrysler sold each Chrysler class vehicle with a Basic Limited Warranty and Powertrain Limited Warranty. The Powertrain Limited Warranty covers the gasoline engine and the cylinder block, also known as the engine block. The engine cylinder block and all internal

parts; cylinder head assemblies; timing case, timing chain, timing belt, gears and sprockets; vibration damper oil pump; water pump and housing; intake and exhaust manifolds; flywheel with starter ring gear; core plugs; valve covers; oil pan; turbocharger housing and internal parts; turbocharger wastegate actuator; supercharger; serpentine belt tensioner; and seals and gaskets.

102.    The Defect is covered by the Powertrain Warranty as the Defect results from Chrysler's failure to institute adequate quality control measures that sufficiently remove a variety of foreign substances and contaminants within the engine, a Powertrain Warranty component, during the engine finishing process.  As a result of FCA's failure, contaminants remain in the engine system and disperse into other parts of the vehicle during normal vehicle operation.  These contaminants include, among other things, casting-sand, welding flux, and other particulate matter, such as silica (a mix of sand and chemicals). These contaminants remain in a closed system and, over time, form a "sludge" or "gunk" that builds up in the vehicle's components in or connected to the closed system, including the heater core, radiator, and oil cooler, causing these components to fail.

103.    Chrysler materially breached its express warranties by manufacturing, selling, and leasing Jeeps that contained the Defect, which rendered the vehicles unsafe or unfit for use as warrantied.

104.    Chrysler was put on notice of the breach by Plaintiffs' efforts to get the vehicle repaired at its authorized dealerships.

105.    In addition, Chrysler's express warranty has failed of its essential purpose due to the Defect continuing to manifest despite efforts by Plaintiffs and Class members to have their Jeeps repaired, yet the Defect remains. Namely, the contaminants remain in the engine, and until the engine is replaced, will continue to damage and destroy the engine components, radiator, oil cooler, and heater core.

106.    As a result of Chrysler's breach of warranties, Class members have sustained damages, including diminished value of the class vehicles.

107.    Chrysler's time limits on its warranties are unconscionable because Chrysler knew or had reason to know that Plaintiffs and Class members would not experience or detect sludge-ike build-up in the early life of the Jeep and, in many instances, such manifestation of the Defect would only occur after the warranty period had expired.   By making false and misleading representations about the nature of the Defect, Chrysler further prevented Class members from timely exercising their rights under the warranties.

108.    Plaintiffs and Class members are entitled to recover all damages as a result of said breach of warranties in an amount in excess of $5,000,000.

**SECOND CAUSE OF ACTION**
**Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301,** *et seq.*
**(On Behalf of the Class or, in the alternative, the New York Subclass)**

109.    Plaintiffs, on behalf of the Class or, in the alternative, the New York Subclass, incorporate all of the foregoing allegations into this cause of action.

110.    Under the Magnuson-Moss Warranty Act, Plaintiffs and Class members are "consumers," Chrysler is a "supplier" and "warrantor," and the Jeeps (and their defective engine blocks) are "consumer products."

111.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

112.    Chrysler's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The class vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

113.    Chrysler breached these warranties as described in more detail above. Without limitation, the class vehicles are equipped with the Defect. The class vehicles share a common defect in that casting sand remains in the engine, and engine components and until replaced, will continue to damage and destroy the engine components, radiator, oil cooler, and heater core.

114.    Under the Act, Chrysler was obligated to disclose to Class members the known Defect within the Jeeps, and was obligated to repair or otherwise remedy the Defect.

115.    Plaintiffs and each member of the Class have had sufficient direct dealings with Chrysler or its agents (including dealerships) to establish privity of contract with Chrysler. However, privity is not required here because Plaintiffs and each member of the Class are intended third-party beneficiaries of contracts between Chrysler and its dealers, and specifically, of Chrysler's implied warranties. These dealers were not intended to be the ultimate consumers of the class vehicles and have no rights under the warranty agreements provided with the class vehicles; the warranty agreements were designed for and intended to benefit consumers only.

116.    Chrysler failed to meet its disclosure and remedy obligations, despite reasonable opportunity to do so.

117.    Chrysler's violation of the Act caused damage to Class members and entitles them to statutory relief.

### THIRD CAUSE OF ACTION
#### Breach of Implied Warranties
#### (On Behalf of the Nationwide Class, or in the alternative, State Classes)

118.    Plaintiffs incorporate all of the foregoing allegations into this cause of action.

119.    Chrysler warrantied that the Jeeps were of merchantable quality and fit for their ordinary purpose.  Chrysler warrantied that the Jeeps' engines had been properly made and would not emit contaminants over time into the radiator and other components, damaging them.  Chrysler breached these implied warranties: the Jeeps were not merchantable because you could not drive them or drive them safely; and the Jeeps' engines, and other engine components, had not been properly manufactured but instead emitted a variety of contaminants over time into the radiator and other components, damaging them, such that the Jeeps' heating and defrosting mechanisms did not work properly even during the early life of the vehicles.

120.    Plaintiffs and each member of the Class have had sufficient direct dealings with Chrysler or its agents (including dealerships) to establish privity of contract with Chrysler. However, privity is not required here because Plaintiffs and each member of the Class are intended third-party beneficiaries of contracts between Chrysler and its dealers, and specifically, of

Chrysler's implied warranties. These dealers were not intended to be the ultimate consumers of the class vehicles and have no rights under the warranty agreements provided with the class vehicles; the warranty agreements were designed for and intended to benefit consumers only.

121.    As a result of Chrysler's breaches of implied warranties, Class members suffered damages.

## FOURTH CAUSE OF ACTION
**(For Unfair and Deceptive Trade Practices in Violation of New York General Business Law ("GBL") Section 349, et seq.)**
**(On Behalf of the New York Subclass)**

122.    Plaintiffs, on behalf of the New York Subclass, incorporate all of the foregoing allegations into this cause of action.

123.    The sale and distribution of the Class Vehicles in New York was a consumer-oriented act and thereby falls under the New York deceptive acts and practices statute, General Business Law Section 349.

124.    Chrysler violated GBL Section 349 by representing that the class vehicles, their engine blocks, and related components had characteristics, uses, or benefits which they did not have, or that the class vehicles, their engine blocks, and related components were of a particular standard, quality, or grade which they were not.

125.    Chrysler's scheme and concealment of the true characteristics of the Defect were material to the New York Subclass, as Chrysler intended. Had they known the truth, the New York Subclass would not have purchased or leased the class vehicle, or—if the class vehicle's true nature had been disclosed and mitigated, would have paid significantly less for them.

126.    Due to the latent nature of the Defect, the New York Subclass members had no way of discerning or otherwise learning that Chrysler's representations were false and misleading and that Chrysler had concealed or failed to disclose facts relevant to the Defect in their vehicles. New York State Subclass members did not, and could not, unravel Chrysler's deception on their own.

127.    Chrysler had an ongoing duty to the New York Subclass to refrain from unfair and deceptive practices under GBL Section 349 in the course of their business. Specifically, Chrysler

owed New York Subclass members a duty to disclose all material facts concerning the Defect because they possessed exclusive knowledge, they intentionally concealed it from the New York Subclass, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

128.    Chrysler's violations present a continuing risk to the New York Subclass, as well as to the general public. Chrysler's unlawful acts and practices complained of herein affect the public interest.

129.    As a result of Chrysler's statutory violations, New York Subclass members sustained injuries and are entitled to relief under the Act.

## FIFTH CAUSE OF ACTION
### (For False Advertising in Violation of New York Gen. Bus. Law Section 350, et seq.)v
### (On Behalf of the New York Subclass)

130.    Plaintiffs, on behalf of the New York Subclass, incorporate all of the foregoing allegations into this cause of action.

131.    Chrysler was engaged in the "conduct of business, trade or commerce." GBL Section 350. False advertising includes "advertising, including labeling, of a commodity. . . if such advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity. . ." GBL Section 350-a.

132.    Chrysler caused to be made or disseminated through New York—via advertising, marketing, and other publications—statements  and omissions that were untrue or misleading to Plaintiffs and New York Subclass Members.

133.    Chrysler made numerous material misrepresentations and omissions of fact with intent to mislead and deceive the New York Subclass members concerning the Class Vehicles, particularly with regard to the Defect. Specifically, Chrysler intentionally concealed and suppressed material facts concerning the quality of the Class Vehicles in order to intentionally and grossly defraud and mislead Plaintiffs and New York Subclass Members concerning the Defect.

134.    The misrepresentations and omissions set forth above were material and likely to deceive a reasonable consumer. The inherent Defect was undetectable to the ordinary consumer.

135.    Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and New York Subclass Members.

136.    Chrysler's false advertising was likely to and did, in fact, deceive reasonable consumers including Plaintiffs and New York Subclass Members about the true characteristics of the Defect.

137.    Chrysler's violations of GBL Section 350 present a continuing risk to Plaintiffs and to the general public. Chrysler's deceptive acts and practices affect the public interest.

138.    The Class Vehicles do not perform as advertised and make them far less valuable than advertised.

139.    Plaintiffs and New York Subclass Members who purchased Class Vehicles either would not have purchased those vehicles at all or else paid less for the Class Vehicles but for Chrysler's false advertising in violation of  GBL Section 350. New York Subclass Members who leased Class Vehicles either would not have leased them at all or would have leased them at a lower cost but for Chrysler's false advertising in violation of GBL Section 350.

140.    Plaintiffs and New York Subclass Members have suffered injury-in-fact and/or actual damages and ascertainable loss as a direct and proximate result of Chrysler's false advertising in violation of GBL Section 350, including but not limited to purchasing or leasing a diminished value or complete lost value for the Class Vehicles purchased or leased.

141.    Plaintiffs and New York Subclass Members have suffered lost or diminished use, enjoyment, and utility of their Class Vehicles along with suffering annoyance, aggravation, and inconvenience resulting from Chrysler's violations of GBL Section 350.

142.    Plaintiffs and New York Subclass Members seek monetary relief against Chrysler measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500.00 each for New York Subclass Member. Because

Chrysler's conduct was committed willingly and knowingly, Plaintiff and New York Subclass Members are entitled to recover three times actual damages, up to 10,000.00.

143.   Plaintiffs and New York Subclass Members also seek an order enjoining Chrysler's false advertising and further seeks attorneys' fees and any other just and proper relief under GBL Section 350.

## PRAYER FOR RELIEF

Therefore, Plaintiffs seek judgment against Chrysler and relief as follows:

A.   An Order certifying this case as a Class Action;

B.   An Order appointing the Plaintiffs as Class Representatives of the National Class and of the New York Subclass;

C.   An Order appointing Plaintiffs' counsel as Class Counsel;

D.   Damages and other relief under statutory or common law;

E.   Attorney's fees and costs;

F.   Pre- and post-judgment interest;

G.   Declaratory, injunctive, and equitable relief; and

H.   Such other relief as is just and proper.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the proposed Class and Subclass, hereby demand a trial by jury as to all matters so triable.

This the 1st day of December 2017.

Respectfully submitted,

*/s/ Mitchell M. Breit*
Mitchell M. Breit
Paul J. Hanly, Jr.
**SIMMONS HANLY CONROY LLC**
112 Madison Avenue
New York, New York 10016-7416
Telephone:  (212) 784-6400
Facsimile:  (212) 213-5949
phanly@simmonsfirm.com

mbreit@simmonsfirm.com

Daniel K. Bryson
John Hunter Bryson
**WHITFIELD BRYSON & MASON LLP**
900 W. Morgan Street
Raleigh, NC 27603
Tel: (919) 600-5000
Fax: (919) 600-5035
dan@wbmllp.com
hunter@wbmllp.com

Gregory F. Coleman
**GREG COLEMAN LAW PC**
 First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: 865-247-0080
Fax: 865-522-0049
greg@gregcolemanlaw.com

*Attorneys for Plaintiffs*


## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 1st day of December, 2017, a copy of Plaintiffs First

Amended Complaint was filed electronically with the Clerk of Court using the CN/ECF system

which will send notification of the filing to all counsel of record


*/s/ Mitchell M. Breit*
Mitchell M. Breit
**SIMMONS HANLY CONROY LLC**
112 Madison Avenue
New York, New York 10016-7416
Telephone:  (212) 784-6400
Facsimile:  (212) 213-5949
mbreit@simmonsfirm.com